**James HEMPHILL, Appellant,**

**v.**

**UNITED STATES of America,**
**Appellee.**

**No. 21432.**

United States Court of Appeals
District of Columbia Circuit.

Argued March 12, 1968.

Decided June 12, 1968.

Mr. Michael H. Gottesman, Washington, D. C., (appointed by this court) for appellant.

Mr. Albert W. Overby, Jr., Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and William H. Collins, Jr., Asst. U. S. Attys., were on the brief, for appellee.

Before WRIGHT, TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

This appeal from convictions of first degree premeditated murder and assault with a dangerous weapon raises three issues: (1) Sufficiency of the Government's evidence as to premeditation; (2) Permissibility of testimony by eye witnesses identifying defendant; (3) Propriety of prosecutor's closing argument.

1. *Sufficiency of the Government's evidence on premeditation.*

This court is of the view that the prosecution presented ample evidence to show that appellant was guilty of an intentional and brutal murder. However, we do not find that its evidence as to premeditation, as to a second reflection in addition to intention, was sufficient to withstand appellant's motion made at the close of the Government's case for acquittal as to first degree murder.[1]

The evidence adduced by the prosecution, largely the testimony of Mrs. Mary Southerland, grandmother of the victim, 10-year old Phillip Richardson, showed a savage killing. Appellant was an acquaintance of Mrs. Southerland, and had been an occasional visitor at her home. They had met when they were neighbors, before the Southerlands moved several blocks away. On the evening of March 24, 1966, appellant stopped by unexpectedly at the Southerland

1. Austin v. United States, 127 U.S.App.D.C. 180, 189, 382 F.2d 129, 138 (1967).

house. Mrs. Southerland and Phillip were watching television. Mr. Southerland was not at home. Appellant asked for, and got, twenty-five cents towards a fifth of wine, and shortly after he bought it he returned to the house. There is no evidence that he had been drinking prior to that. Appellant and Mrs. Southerland then talked for more than an hour, laughing and chatting amicably with no heated discussions, arguments, or threats. Both drank some wine; neither very much. Asked whether appellant did anything unusual during their discussion, Mrs. Southerland said only that he "kept getting up, walking back and forth to the window," and asked repeatedly when Mr. Southerland was expected home.

As the evening wore on, Phillip went upstairs to go to bed. Mrs. Southerland grew tired and gently suggested that appellant go, because she wished to go to sleep. Appellant did not pick up this suggestion. At about 10:40 p. m. Mrs. Southerland grew very drowsy and "dropped my head down in my hand." She stirred and reached over to get something from the table, at which point "something struck me on the side of the head." A succession of blows knocked her to the floor. Unable to defend herself, she lay still. Although Mrs. Southerland, who was blind in one eye, did not actually see her assailant strike, she was positive that it was appellant. Other than Phillip, he was the only person in the house. He was standing behind her.

While lying on the floor, Mrs. Southerland heard "quick footsteps." She thought they were headed for the front door. Slowly she started to drag herself across the room to her rear door and the backyard. Unexpectedly, she heard her grandson "screech" in his upstairs room, and then she herself began to scream. She finally worked her way through the door and into the backyard. Suddenly two more blows hit her. With these she passed out. When the police

arrived at the Southerland house Phillip Richardson was found on the bed in his bedroom. The lad, his bed, the walls, the floors, all were covered with blood. He had been hit repeatedly with a blunt instrument, and the blows to his head killed him.

In considering whether premeditation is permissibly inferred from this evidence we revert to the opinions in Austin v. United States,[2] and Belton v. United States.[3] In *Austin* the evidence showed a killing caused by twenty-six major stab wounds from a pocket knife. There was no testimony indicating motive. The court held the evidence was as consistent with an impulsive and senseless frenzy as with premeditation, and did not permit a reasonable juror to find beyond reasonable doubt that there was premeditation. In *Belton*, the court upheld a first degree murder conviction where the evidence showed that defendant quarreled with his common law wife, brought a loaded gun with him to her apartment, and shot her soon after he entered.

█ In the present case when the trial judge asked what evidence the Government was relying on to establish premeditation, the prosecutor referred only to the fact that the killer had climbed a flight of stairs to Phillip's room. Though the time to go upstairs is more likely to be measured in seconds than minutes, we may assume it was appreciable enough to have been consistent with a killing that was the product of deliberation rather than impulse. But the jury may not find premeditation solely from the fact that defendant had time to premeditate. This is established by *Austin*, where there was time enough for premeditation but the facts of the killing were equally consistent with a mind in the grip of a sustained frenzy. The prosecutor made no attempt to show animosity or any other motive for the killing by appellant. Appellant and Mrs. Sutherland were friends, and they had

2. *Supra* note 1.

3. 127 U.S.App.D.C. 201, 382 F.2d 150 (1967).

spent the evening in ordinary and casual conversation.

We consider evidence relied on by our dissenting colleague: Mrs. Southerland testified that defendant made several trips to the window, looked out and returned to his chair. Each time he asked her when George, her husband, would be home and she replied, about 1 a. m. He also asked whether her daughter was coming over. "It was like he was looking for someone, expecting someone, by going to the window and kept asking that question." Two or three times defendant said he was leaving and Mrs. Southerland bade him goodby, saying she enjoyed his company and suggesting he return when George would be at home, to be "more company for you than I." At 10:40 p. m., 10 minutes after defendant had gone to the window again, Mrs. Southerland said she was tired and had to go to bed, and would not wait up for George as she usually did. Defendant said yes, he had to get home too. He went to the window and leaned on the windowsill, looking up and down the street, for what seemed to her a long time. She dropped her head in her hand, repeated she felt tired, and when she reached over to the table, for cigarettes or a newspaper, she was struck on the head.

What was the significance of this walking to the window? Is it probative that he was harboring an intent to kill or maim? Such an inference while not inconceivable is surely highly speculative. All Mrs. Southerland thought at the time, and it certainly seems the more natural explanation, is that he was looking for some one. True the jury could also consider that defendant did strike her, but the issue is whether these blows reflected some spur-of-the-moment impulse or a preceding premeditation and reflection. Could a reasonable man fail to harbor a reasonable doubt as to the existence of prior premeditation and deliberation? We think not—especially taking into account the standard, properly charged by the trial judge,[4] that requires a reasonable man to believe in the facts of guilt without even "such a doubt as would cause him to hesitate to act in matters of importance to himself."

The essence of the matter is that this perplexing testimony serves to raise doubts rather than resolve them—especially when conjoined with the prosecution's failure to bring out whether defendant brought the murder weapon with him or whether it merely happened to be lying about in the Southerland home, available at the very moment defendant first formed an intent to kill.

■■ Although the Government preserves the contention that it could be inferred from appellant's going to the window, etc., and ignoring the "veiled" request that he leave, that he had a preconceived intent to do harm to Mrs. Southerland and her grandson, the Government emphasizes that there was cogent evidence of a specific purpose in the fact that appellant used a hammer, and that it was inherently improbable that he picked up a hammer in Mrs. Southerland's living room. That brings us to the heart of this case. A prosecutor seeking a first degree murder conviction for premeditated murder has an obligation to bring forward evidence indicating not only intent to kill but also facts from which premeditation may be inferred. In the absence of other testimony truly probative of premeditation and deliberation, the origin of the murder weapon is of undeniable significance.[5]

4. *See,* McGill v. United States, 121 U.S. App.D.C. 179, 348 F.2d 791 (1965); Scurry v. United States, 120 U.S.App. D.C. 374, 347 F.2d 468 (1965).

5. In *Belton* the court emphasized that the prosecutor had established that the defendant brought the gun with him to the apartment, and affirmed the first degree murder conviction. On the same day, the court reversed the first degree murder conviction in *Austin,* where the weapon was available even in the absence of prior intention since it was a knife defendant customarily kept in his pocket and used to trim his nails.

Yet the Government went to the jury on evidence as to the premeditation that was at best highly speculative, without introducing evidence on the simple yet meaningful point of whether defendant brought the hammer with him.

Now the Government asks this court to close the gap in its proof with the assumption that people do not usually have hammers lying about, and therefore appellant probably brought the hammer with him. We think it inappropriate to forge a chain of such surmise in a first degree murder case where the gaps in this aspect of Government evidence are so easily closed by careful preparation.

■ Since it cannot permissibly be assumed that defendant brought the hammer with him, there is no basis for permitting the jury to infer that the evidence established beyond a reasonable doubt that the initial assault on Mrs. Southerland was preceded by premeditation. The attack was without warning or apparent reason. Indeed, the prosecutor himself seems to have recognized this in stressing the time to climb the stairs as the basis for inferring premeditation for the attack on the boy. We see no basis on which a reasonable jury could, starting with the assumption of an impulsive attack on the grandmother, and taking into account the short time involved and the quality of the sequel, a bloody attack on a sleeping boy, have found beyond a reasonable doubt that there was an interruption to the impulse or frenzy sufficient to justify the inference of reflection and premeditation.

■■ It is settled that the law prohibits upholding a jury finding of premeditation where the evidence is so skimpy that a reasonable man must have a reasonable doubt. The setting aside of criminal convictions on appeal because of insufficiency of evidence supporting the charge is neither novel, nor a "frightening" power. *See, e. g.,* Smith

v. United States, 151 U.S. 50, 14 S.Ct. 234, 38 L.Ed. 67 (1894); Schaefer v. United States, 251 U.S. 466, 40 S.Ct. 259, 64 L.Ed. 360 (1920).

Our conclusion does not rest for one moment, as our dissenting brother seems to suppose, on a judgment about credibility of witnesses. Our point is, simply, that giving Mrs. Southerland's testimony full credence, it simply is not evidence permitting premeditation to be found beyond a reasonable doubt.

■■ Premeditation and deliberation are facts, susceptible of proof like any other facts in a criminal trial. The jury is not supposed to be rendering a moral judgment of culpability based on whether it likes the defendant, or is horrified by the brutality of his killing. Whatever the difficulties of proving states of mind, and whatever the wisdom of distinguishing degrees of murder on that ground, the law now puts the burden of proving premeditation and deliberation on the prosecutor, and moreover requires that his evidence do so beyond reasonable doubt.

The issue as we see it is whether the facts of a horrible crime should lead this court to sidestep its duty to consider what a reasonable juror may infer has been established beyond a reasonable doubt.

■ We hold that on the evidence presented in the prosecution's case appellant's conviction may be of no more than second degree murder. However, the evidence of guilt as to that offense is overwhelming. Accordingly we deem it appropriate to follow the alternative suggestion made by the Government, that if the evidence is found insufficient to establish first degree murder the court should follow the procedure set forth in *Austin,* permitting sentencing for second degree murder without a new trial.[6]

---

6. In view of our disposition of the issue as to sufficiency of evidence we need not reach a fourth issue raised by appellant concerning the adequacy of the judge's charge on first degree murder in light of Austin v. United States, *supra* note 1.

As to the final observation of our dissenting colleague, it suffices to note that a man on trial for premeditated murder is automatically on trial for second degree murder as a lesser included offense. Hansborough v. United States, 113 U.S.

## 2. *Permissibility of identification testimony.*

 We reject the contention made for the first time on appeal, that the admission of eye witness testimony identifying appellant with the crime violated due process. There were two witnesses to the brutal assault on Mrs. Southerland in her backyard. That area was brightly lit by floodlights, and both witnesses were within forty feet of where Mrs. Southerland was struck. Moreover, one of the witnesses had a close view of the assailant as he came out of the door of the Southerland house and walked by on the sidewalk, hammer in hand. Both witnesses identified appellant as the man they had seen. The identifications were made when the police brought him back to the scene of the crime to confront Mrs. Southerland, who was then being put into an ambulance to take her to the hospital, where she was to require two month's intensive treatment.

Appellant's claim is predicated on the fact that at the time of the identification appellant was in police custody, and was not identified from a line-up. Such identifications present the danger that they may be the product of police suggestion rather than true recall. In this case we are clear that we do not have before us a situation where "the confrontation conducted * * * was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). That is the standard governing identifications taking place prior to the issuance of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

When the police arrived at Mrs. Southerland's house, she told them that appellant had attacked her. They went and got him, and brought him back to the scene to make sure that this was the man Mrs. Southerland had meant. In view of the seriousness of Mrs. Southerland's condition, appellant concedes that this course was proper under *Stovall.* Yet from all that appears in the record, the other identifications were entirely incidental. The two eyewitnesses were in the crowd that had gathered in front of the home and identified appellant when he was brought back by the police. The confrontations were not planned by the police, and in the excitement of the moment—particularly a pre-*Wade* moment—they can hardly be faulted for failing to ensure that they did not come about. We therefore need not consider whether the police conduct was in any event proper under Wise v. United States, 127 U.S.App.D.C. 279, 383 F.2d 206 (1967).

## 3. *Prosecution's closing argument.*

 Appellant's final point is that the prosecutor "testified" to the jury during closing argument. At trial a police officer testified that appellant had "little specks of blood about his chin" when he was arrested, and that subsequently, when searching appellant's apartment pursuant to a warrant, the officer turned up, among other items, some garments and a hammer which had on them a substance that the officer thought was blood. In his closing argument, appellant's trial counsel emphasized the prosecutor's failure to provide scientific proof that these items had blood on them. Arguing that the jury was being asked to speculate, defense counsel said that the stains on the clothing did not look like blood stains to him. He also stressed that the prosecutor had not claimed that appellant's handprint matched a "bloody handprint" that a police officer had mentioned see-

App.D.C. 392, 308 F.2d 645 (1962). Our *Austin* opinion, *supra,* holds that a Federal appellate court setting aside a conviction for lack of sufficient evidence of premeditation may provide for sentencing on second degree murder without a new trial. That is the settled doctrine of the state courts governed by similar statutes, and we adhere to it.

ing on the Southerland's living room wall.

In rebuttal the prosecutor argued, concerning blood on the garments, "of course you can't see it a year and a half later." [7] As to the bloody handprint, the prosecutor argued that the jury should disregard the failure of evidence as to it, because it was impossible to get such a print off the wall to match it with that of defendant.

Appellant contends that both of these arguments lack support in the trial evidence. He contends, moreover, that both are incorrect as a matter of fact: that blood stains, once set, are ineradicable, and that walls may be photographed for hand fingerprints. No objection was made to the arguments at trial. In our judgment this is not a case for invoking the plain error rule.

While the prosecutor's comment on the handprint was unwarranted, however well-intentioned, it must be considered in context. The handprint was entirely peripheral to the Government's case. It was merely mentioned by an officer as something he had seen when he entered the Southerland house. Under the circumstances we do not think it appropriate to assign reversible error to a prosecutor's comment on a point not stressed in his own case, which was interjected in the trial unexpectedly, on defense closing, in the absence of timely defense objection affording opportunity for correction of error.

We cannot pass so easily the issue of the comment on the blood-stained garments, since the reference to these was an integral part of a substantial line of testimony for the prosecution. "On a nerve-center issue we are more likely to hold the prosecutor to account." [8] But since no objection was made to the prosecutor's argument, we are forced to glean what we can as to his meaning, and the jury's understanding of it, without the clarification that would have been afforded by prompt objection. We think the prosecutor's argument may be taken as a response to defense arguments that the stains did not look like blood stains, and as an allusion to the point, omitted by defense counsel, that such stains darken with time. We need not decide the permissibility of the prosecutor's response on this reading—since (a) if there had been objection, the trial court could have considered whether prosecution's comment may have been arguable as a matter of general knowledge, or justified once defense counsel opened the door with his comment; and if not could have provided opportunity for correction; and (b) the evidence of guilt was overwhelming.[9]

At oral argument we were informed that the items admitted into evidence had, prior to trial, been sent to the FBI for laboratory analysis. Our imputation of proper meaning to the prosecutor's comment is possible only on the assumption that the items were in fact found to have been bloody. As this case must in any event be remanded to the trial judge for sentencing as to second degree murder, we think it appropriate to direct that appellant be permitted to obtain copies of the FBI reports on laboratory tests run on the items. In the further proceedings on remand appellant may move for a new trial if those reports indicate that no human blood was found on the items.

Remanded for further proceedings.

TAMM, Circuit Judge (dissenting):

I am unable to agree with the majority conclusion that the evidence before the jury was so insufficient as to premeditation as to require the trial court to direct a judgment of acquittal to the first de-

7. The prosecutor continued: "Don't forget when Officer Mosrie recovered those items, it was the next day. * * * But a year and a half later, counsel argues to you that he can't see any blood on the clothing."

8. King v. United States, 125 U.S.App.D.C. 318, 330, 372 F.2d 383, 395 (1966).

9. Cross v. United States, 122 U.S.App.D.C. 283, 353 F.2d 454 (1965).

gree murder charge at the close of the Government's case. Of course, premeditation is an essential element of the Government's evidence in establishing a first degree murder charge, but a knowledgeable, experienced trial judge and a carefully selected jury acting under instructions unchallenged as to their adequacy or propriety found that the evidence before them established premeditation beyond a reasonable doubt. Despite this record, however, the majority exercises a frightening power by setting aside the jury's verdict on this important issue, and without any firsthand knowledge of the relative credibility to be afforded the several Government witnesses, as that credibility can only be determined by actual observation in the courtroom.

What was the evidence on the premeditation issue that was so convincing to the trial judge and the jury but which is held to be so unconvincing and inadequate by the majority?

The Government's case clearly showed a vicious attack on Mrs. Mary Southerland, and as the majority opinion frankly describes it, "a savage killing" of her 10 year old grandson Phillip Richardson. Briefly confining my citations from the evidence to those aspects supporting the finding of the existence of premeditation, it is to be noted that appellant visited the home of Mrs. Mary Southerland and her grandson on the evening of March 24, 1966. Despite some testimony relating to a wine purchase and its drinking there is no claim or evidence of intoxication of either appellant or Mrs. Southerland. At some point Phillip went upstairs and remained there. Conversation in the Southerland living room between the two was casual and labored to the point where Mrs. Southerland repeatedly complained of being tired, but appellant remained in the residence, although he kept repeatedly walking to and looking out of the window (Tr. 44). At 9 p.m. and again at 9:30 p.m. appellant manifested some action as if about to depart but on each occasion he "looked out" of the window, "looked up and down the street" and returned to again sit down (Tr. 44–45). Again at twenty minutes to ten after Mrs. Southerland had repeated her statement of feeling tired, the appellant "kept asking [her] over and over each time he would be walking to the window 'What time did you say George gets home?'," referring to Mrs. Southerland's husband. Through this sequence appellant repeatedly asked Mrs. Southerland whether her daughter would be coming to the residence. Her testimony continues:

At 20 minutes to 11 he got up again and he looked up at the clock. He said it's 20 minutes to 11. I said it most certainly is, Mr. James, and I have to go to bed. So he says, yes, I have got to get home, too.

He walked over to the window and leaned down on the windowsill *looking up and down the street. It seemed like such a long time.* I can't judge because of my being tired and bored. It probably seemed longer than it was. But I dropped my head down in my hand like that. * * *

I raised my hand up and I reached over on the table. * * * I don't recall whether I was going to pick up the cigarettes or the paper with the crossword puzzle, but when I did reach over, something struck me on the side. (Emphasis supplied.)

(Tr. 46–47.)

Mrs. Southerland thereafter recounted that her glasses came off, that she was still being struck and that she next remembered being on the floor, but unable to defend herself, she "just lay still" (Tr. 48) and as she was lying on the floor she heard what she described as "quick footsteps and for a short distance." (Tr. 49.) During this entire period appellant was the only other person in the room (Tr. 47–49). She dragged herself to a hallway leading to a utility room and managed to open a door. As she dragged herself out of that door she heard her grandson Phillip "screech" in a manner which she had never heard before. (Tr. 51.) She testified "I don't

know whether he was saying 'no' or 'oh'. It was an 'oh' sound." (Tr. 51.) At this point she screamed, and may have lost consciousness. She next recalled attempting to pull herself to her feet, and as she did so she was struck again at least twice before she again lost consciousness. Two neighbors, attracted by the screams saw a man, subsequently identified as appellant, striking Mrs. Southerland with a hammer after she had reached the yard of her residence. A neighbor identified appellant leaving Mrs. Southerland's house after the assault and carrying a hammer.

A detective of the Washington Police Department testified that when he arrived upon the scene, Mrs. Southerland was "covered with blood from head to foot." (Tr. 116.) He testified that the Southerland living room showed signs of a scuffle with blood on the floor, furniture and walls. He proceeded to the second floor, to a bedroom with a light burning, where he found the body of 10 year old Phillip Richardson. "He was covered with blood. There was blood all over the bed, the walls, the floor, just all over the place." (Tr. 116.) A short time thereafter appellant was arrested in his own home, this officer observing "little specks" of blood on appellant's chin although he was "very calm." The next day the police officer in executing a search warrant at appellant's home recovered from a hall closet a hammer having on it a "substance which I thought to be blood."[1]

I have omitted from this review of the evidence most of the gory detail, enumerating only the basic material which was before the trial judge when the Government rested its case in chief. I do feel that this evidence justified and required the trial judge to submit this evidence to the jury for consideration under the first degree murder charge in the indictment. The trial judge is required to consider the evidence at this point, including all legitmate and logical inferences to be drawn therefrom in the light most favorable to the Government. "In the *Curley* opinion[2] we said that in deciding whether to submit a case to the jury the trial judge must consider whether reasonable jurymen must necessarily have a reasonable doubt or whether, on the other hand, the evidence was such that a reasonable mind might fairly have a reasonable doubt *or might not* have such doubt. We further said that *for the jury* to convict, it must be persuaded of the defendant's guilt beyond a reasonable doubt, and our holding emphasized that the standard for the jury is *different from what the trial court must consider in deciding whether the case may go to the jury.*" (Last emphasis supplied.) Crawford v. United States, 126 U.S.App. D.C. 156, 158, 375 F.2d 332, 334 (1967). In *Curley* we succinctly summarized the law thus: "It is not disputed that upon a motion for a directed verdict, the judge must assume the truth of the Government's evidence and give the Government benefit of all legitimate inferences to be drawn therefrom." *Curley, supra,* 81 U.S.App.D.C. at 392, 160 F.2d at 232.

The majority opinion, however, turns its back on *Crawford* and *Curley* and cites our fairly recent opinion in Austin v. United States, 127 U.S.App.D.C. 180, 382 F.2d 129 (1967) as somehow defining the factors and elements which may or may not establish premeditation. By the utilization of "homespun terminology" constituting dramatic colloquialisms in popular use but of questionable legal significance the court relied heavily upon the phrase "in cold blood" as describing the nature of first degree murder. This discussion therein related, of course, to our present problem of the evidence nec-

[1]. There is an unfortunate void in the record as to the stains on the hammer and other items of clothing which were thought to be blood. Whether laboratory examinations of these objects were made and the results, if any, of the examina-

tions was not the subject of any testimony offered at the trial.

[2]. Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, cert. denied 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). (Footnote not in original.)

essary to establish premeditation. The phrase was there used to distinguish a premeditated homicide from one "committed on impulse or in the sudden heat of passion." We went so far as to suggest to trial judges that "[t]he analysis of the jury will be illuminated, however, if it is first advised that a typical case of first degree murder is the murder in cold blood; that murder committed on impulse or in sudden passion is murder in the second degree * * *." 127 U.S. App.D.C. at 188, 382 F.2d at 137.

I am unable to fathom the reasoning of the majority that concludes as a matter of law that this was a murder "committed on impulse or in sudden passion." The Government's evidence, viewed in the light most favorable to it, established that appellant came to Mrs. Southerland's home (Tr. 37, 58); that he left to get and returned with some wine (Tr. 37, 58); that the deceased went upstairs (Tr. 43); that appellant's conversation was slow and Mrs. Southerland bore the burden of carrying on the conversation, despite her repeated reminders to him that she was tired (Tr. 44); that appellant "kept getting up, walking back and forth to the window" and "kept asking [her] over and over each time he would be walking to the window" what time her husband would return from work and if her daughter would visit her (Tr. 44, 46). It established through her testimony that she started to receive blows at a time when appellant was the only other person in the room, which blows only stopped when she ceased to move (Tr. 47–49). It established that after she managed to grope her way out of the back door of the house, she heard her grandson cry out "no" or "oh" in a manner which she had never heard before; that the next thing she remembered was trying to pull herself up by using a post in the backyard, at which time she again began to receive blows (Tr. 50–53). I believe this evidence clearly required the learned trial judge to deny the request for directed verdict. I further believe that it not only negatived completely any suggestion of an impulsive or sudden passion

killing but affirmatively supported and justified a finding both of deliberation and premeditation on the jury's part. I would accordingly affirm the conviction of first degree murder.

The court's action today results in a situation which if legally sound, is nevertheless difficult for laymen to understand. The appellant has been found guilty of second degree murder not by a jury, because the jury by its vote rejected the second degree charge, but by a panel of this court. He is to be sentenced then for the commission of a felony for which he has not been afforded a jury trial, upon a verdict of guilty rendered by judges who have never seen or heard a single witness in the case.