**UNITED STATES of America**

v.

**Freddie A. BROOKS, Appellant.**

Nos. 22607, 24064.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 16, 1970.

Decided June 29, 1971.

Mr. Charles E. Yonkers, Washington, D. C., with whom Mr. John D. Conner, Washington, D. C. (both appointed by this Court) was on the brief, for appellant.

Mr. Henry F. Greene, Asst. U. S. Atty. with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry and Robert A. Shuker, Asst. U. S. Attys., were on the brief, for appellee.

Before LEVENTHAL and ROBINSON, Circuit Judges, and SMITH,* Chief Judge, U. S. District Court for the District of Montana.

LEVENTHAL, Circuit Judge:

This is an appeal from a judgment entered on convictions for first degree premeditated murder and possession of a prohibited weapon, sentencing appellant to concurrent terms of life and one-year imprisonment, respectively. We reject appellant's contention that there was insufficient evidence of premeditation. Appellant also challenges the admission of the testimony of certain identification witnesses in view of what is claimed to have been improper pretrial confrontations. This claim may have some merit, but we do not decide that issue, because for various reasons, including our conclusion that the other clear evidence of guilt established any such error as harmless, we find no basis for reversal.

## I. THE FACTS

The evidence at trial disclosed that at about 9 p. m. December 18, 1967, appellant left the home of his girl friend, Patricia Robertson, at 1323 Tenth Street, N.W., Washington, D.C. saying he was going out to get some "fresh air" and to visit a friend on Sixth Street. (Tr. 268). He was wearing a maroon shirt and brown pants, and was carrying a briefcase.

A few blocks away is the Medical Associates Pharmacy, 915 Rhode Island Avenue, N.W. At about 9:15 or 9:20 p. m. Eugene Pressley, brother-in-law of the decedent Helen Pressley, entered the pharmacy building, where he was employed, and noticed a dark-complexioned man, about six feet tall, dressed in light coat, dark trousers, and sport hat, and carrying a briefcase, standing on the steps of the building. When he left the pharmacy about five minutes later, he noticed that the man was still there, and that the man had made an attempt but failed to catch a passing bus. Pressley testified that the man "resembled" appellant in size and complexion. (Tr. 91–93).

At about 9:30 p. m. James and Helen Pressley and their four-year-old son drove up and parked on Rhode Island Avenue across the street from the Pharmacy, where James was also employed as a delivery man. They got out, crossed the street, and Helen Pressley and the boy got into one of the pharmacy cars parked directly in front of the building. It was the Pressleys' custom to drive home in one of these cars. James Pressley entered the pharmacy to check out.

James Pressley did not notice anyone else near the building as he went in. Nor did another pharmacy employee, William Cornish, who moments later arrived at the building and paused to talk briefly with Mrs. Pressley and to play with her son, sitting in the car, before he entered the building.

Shortly thereafter, two young men, Barry Daniels and Stephen Nixon, driving eastward on Rhode Island Avenue, stopped their car at the corner of 9th Street. Barry Daniels, the passenger, testified that his attention was drawn to a parked car, with a lady and little boy

* Sitting by designation pursuant to 28 U.S.C. § 292(c) (1964).

in it, because of the movement of the lady and her screaming. He also noticed a man standing next to the car on the passenger's side. According to Daniels, the man started walking east on Rhode Island as the lady got out of the car. Stephen Nixon, the driver, testified that he noticed the woman "acting upset" and "moving up and down" in a parked car. He then noticed "something running down the street. It was a man carrying a briefcase." Thinking that the man had stolen the woman's purse, Nixon called to him to stop. When he began to run instead, Nixon and Daniels decided to pursue him in Nixon's car.

The chase of this man, later identified as appellant, is a crucial aspect of the evidence. The appendix to this opinion is a map which locates the places that will be referred to in this opinion.

The chase began with Nixon and Daniels following the man north on Ninth Street. They lost sight of him and turned left into an alley which led them behind the pharmacy.

Meanwhile, about 9:35 p. m., James Pressley and William Cornish were summoned to the entrance of the pharmacy by the screams of Pressley's son. As Pressley reached the door, he saw his wife collapsing outside, blood "gushing" from a stab wound in her neck. A fellow employee was sent to get Dr. Lynwood Rayford, who maintained offices in the building.

At this moment Dr. Rayford was walking out of the back entrance of the pharmacy, going to his car with Eddie Pressley, James' brother. As they were walking behind the pharmacy Eddie Pressley noticed a "young man walking at a terrific pace carrying a briefcase in his right hand." His attention was drawn to the man because the man was moving at a very fast pace, and brushed against a bush growing through a wire fence at the alley's edge in an effort to stay as

far away as possible from Pressley and Dr. Rayford. Pressley testified that the area in back of the pharmacy was "very well lighted." He was able to see the face as well as the general build and clothing of the man.[1] He identified the man as the appellant.

Dr. Rayford remembered someone approaching him and Eddie Pressley behind the pharmacy. He testified the man had an attache case and "he seemed to be in a hurry and he seemed to want to stay as far away from us as possible." He could only describe the man as tall, thin, and dark.

As the man walked past them, Pressley observed a red car in the alley coming towards them from the same direction as that from which the man had come. The car, driven by Nixon and Daniels, passed them and turned left toward Rhode Island Avenue to the front of the pharmacy. As the car passed, Dr. Rayford heard someone inside say, "There he goes." Eddie Pressley and Dr. Rayford followed the car to the front of the pharmacy where they found Mrs. Helen Pressley. Dr. Rayford pronounced her dead at the scene.

When Daniels and Nixon arrived in their car at the front of the pharmacy, they quickly told Cornish and James Pressley they were in pursuit of a man, and Cornish and James Pressley joined in the chase on foot.

The man fled west on Rhode Island Avenue, north on Tenth Street and west on R Street. At the intersection of Eleventh and R Streets, Nixon and Daniels caught up with the man, who was still holding the briefcase. As they came alongside him, the man ran to the car and began slashing at Nixon with a knife. (Tr. 146, 166). Nixon succeeded in rolling up the window and putting the car in reverse. As he did so the man's knife fell into the car.[2]

---

1. He testified the man was about six feet tall, 165 pounds, dark complexion, wearing dark trousers and light coat and hat.

2. At trial Daniels stated that Brooks "resembled" the attacker. Nixon did not see anyone in the courtroom resembling the man they had chased that night.

The man then ran east to the intersection of R and Tenth, where he was met by James Pressley and Cornish. Pressley heard Nixon yell, "There goes the guy," and saw the man duck behind a panel truck on R Street. The man reemerged with his briefcase in his left hand and wielding a shotgun in his right. James Pressley drew the pistol he normally carried as the delivery man for the pharmacy, and fired three shots at the man. The man was able to flee, jumping over some fences on the north side of R Street. He dropped his briefcase as he ran. It was later found to contain two live .12 gauge shotgun shells.

When three shots were heard by Jobe Keyes, a resident of 1706 Tenth Street, N.W., he looked out his window and saw a man with "something long in his hand * * * [which] looked like a pipe or a gun" run north in an alley between Tenth and Eleventh, N.W. Moments later William Cornish saw a man "approximately 5-10 or 6 feet emerge on French Street which runs north of R and parallel to it. It appeared to Cornish as if the man was cradling some type of object because of a bulge on the back of his coat. Cornish and James Pressley ran north on Tenth Street and east on French, but lost sight of the man they were chasing.

However, shortly before 10 p. m. Linda Winston standing on the porch of a residence at Tenth and French Streets, N. W., saw a man run east on French Street with "a shotgun under his coat," and observed that he paused to look back and then entered the basement of a house on the corner of Ninth and French Streets, as two other men came down French Street "looking for him."

That house—901 French Street, N.W. —was owned by Martha Fewell. Among her tenants during the previous two years had been appellant, whom she treated as a "godson." She testified that just before 10 p. m. on the evening of December 18, 1967, appellant entered the house wearing dark-colored jacket and pants. His clothes were torn, his hands were cut, and he wore no hat. He told her that five men had robbed him, and that he was worried about the police getting his briefcase. Before she drifted off to sleep she heard appellant make a telephone call and say, "listen and do what I tell you to * * * I been robbed."

Appellant's call was to his girl friend, Patricia Robertson, who testified he told her that he had been robbed, and asked her to bring some fresh clothing to the house on French Street. Between December 18 and December 21, appellant stayed with Miss Robertson at her house. On December 21, he left to go to Durham, North Carolina because someone had called to say his sister had died. He was arrested by FBI agents in Durham on December 30.

Late in the evening of December 18, the police recovered a knife, on which traces of human blood were found, from the floor of Steven Nixon's car. Although no fingerprints were found on the knife itself, Patricia Robertson testified that it looked like one that she had previously seen in appellant's possession. On the same night Detective Antonio Ruiz of the Metropolitan Police found a man's black and white dress hat in the rear yard of 1702 Tenth Street. (Tr. 303–04). The police recovered a hair from the headband of the hat. Laboratory tests showed it to be dissimilar to hairs which had been removed, by court order, from appellant's head. However, Eugene Pressley testified that the hat resembled the one worn by the man he saw standing in front of the pharmacy that evening, and Miss Robertson identified the hat, or one "like it," as belonging to appellant. Miss Robertson also identified the briefcase, recovered by James Pressley and containing the two shotgun shells, as the one that appellant had with him when he left her apartment on the evening of December 18.

Three days later, on December 21, the police found a sawed-off shotgun under the front steps of 901 French Street. No identifiable fingerprints were found, but James Pressley, William Cornish and Linda Winston all testified that the gun

looked like the one that the man was carrying on the night of Helen Pressley's murder.

On April 26, 1968, appellant was charged in a four-count indictment with first-degree premeditated murder, first-degree felony murder, attempted robbery, and possession of a prohibited weapon (22 D.C.Code §§ 2401, 2902, and 3214(a)). He was tried to a jury in District Court on December 10–13, 1968. At the close of the Government's case the court granted appellant's motion for acquittal on the felony-murder and attempted robbery counts. The trial continued on the two remaining counts and the jury returned a verdict of guilty as to each.

## II. IDENTIFICATION ISSUES

*Pretrial confrontations with identification witnesses.*

At the trial three witnesses—James and Eugene Pressley and Barry Daniels—testified that appellant "resembled" Mrs. Pressley's assailant.[3] A fourth witness, Eddie Pressley, positively identified appellant as the man he saw in the alley that night.[4] Eddie Pressley also stated, on cross-examination, that he had seen appellant in the Commissioner's office before trial, and had "pointed him out to the Commissioner."

Appellant claims that this resemblance and identification testimony was tainted by improper confrontations with the witnesses before trial, and should have been excluded. Specifically, he claims that he was exposed to these four witnesses during pre-trial hearings in late January

and early February, at a time when he was without aid of counsel. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In addition, he states that his exposure to these witnesses at the Commissioner's hearing on February 28 was so suggestive as to violate due process, even though defense counsel was present. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

The Government does not expressly deny either the lack of counsel at certain of these pre-trial confrontations, or their suggestivity. Rather it contends that the testimony of these three "resemblance" witnesses—James and Eugene Pressley and Barry Daniels—was not an identification, and hence does not come within the rationale of United States·v. Wade, *supra*. The Government concedes that Eddie Pressley made a positive identification at trial, but defends the admission of this identification on the basis of independent source. As for his testimony regarding pre-trial identification at the February 28 hearing, the Government responds that this was elicited not on direct examination, but by appellant himself on cross.

These issues were raised in District Court through a motion for vacation of judgment and new trial, filed by appellant pursuant to 28 U.S.C. § 2255. After hearing argument on what appellant would attempt to show, the court denied his motion without further hearing, and stated that resemblance testimony could not be construed as identification, and that Eddie Pressley's testimony was sup-

---

3. The Government asked approximately the same question—"Do you see anybody/anyone in the courtroom today who resembles the person you saw * * *?"—with the following responses:

Eugene Pressley—Yes, the Defendant—he resembles the man that was standing there * * * by the size and his complexion.

James Pressley—Yes I do. * * * The Defendant. (Pointing)

William Cornish—I was not close enough to make a facial identification. The only possible identification that I could give would be approximately the

height and weight * * * (Defendant standing) Approximately the height. The weight is hard to tell because he did have on a coat, but it is approximately the right length.

Barry Daniels—Well, Mr. Brooks over there, he does resemble him. Mr. Brooks does resemble him.

Stephen Nixon—No I don't.

4. Eddie Pressley was asked, "Do you see in the courtroom today a person whom you saw in the alley that night?" and answered "Yes I do. (Referring to the Defendant)."

ported by independent source. (Memorandum and Order of Feb. 19, 1970, D. D.C., Crim. No. 476–68.)

It is not clear from the record when and under what circumstances the confrontations occurred. However there are facts that warranted further exploration if these issues are controlling. In view of the procedural posture of the case, we must assume that there were occasions in which "resemblance" witnesses viewed appellant in the absence of counsel,[5] and that there was undue suggestiveness in the confrontation with appellant at the February 28 hearing,[6] where appellant was represented by Legal Aid Agency counsel, as to both the resemblance witnesses and Eddie Pressley. Making this assumption, we nevertheless affirm for the reasons to be stated.

*Independent source for in-court identification by Eddie Pressley*

First, we think it clear that Eddie Pressley's identification was supported by independent source. He was outspoken concerning his ability to observe, an ability underscored by the fact that the alley was "very well lighted."

■ Pressley stated positively that he had seen appellant's face and that he could have identified appellant even if he had not seen him in the Commis-

sioner's office. His attention was specifically drawn to appellant because of his fast pace and the lengths to which he went, brushing into a bush, to stay as far away as possible from Pressley and Dr. Rayford. He testified as to the characteristics of the man he saw— height, weight, clothing, and the fact that he was carrying a briefcase. These characteristics were in accordance with the observations of other witnesses, including those who had known appellant prior to that night. The only point as to which appellant claims that Eddie Pressley's testimony at trial differed from the statement he gave to the police three hours after the events of the night related to a matter that was not immaterial but was relatively minor.[7] We find no error in the trial court's conclusion that Eddie Pressley's in-court identification confrontation rested on an independent source.

■ As for Pressley's testimony concerning his pre-trial identification of appellant, since this was elicited on cross-examination, it is not ground for reversal. Appellant could have aired the confrontation issues without putting evidence of pre-trial identification before the jury by requesting a hearing, outside the presence of the jury, on whether the pre-trial identification by

---

5. At the preliminary hearing on February 28, 1968, Eddie Pressley stated that he had seen appellant during the "second or third hearing" in the Commissioner's office. He also testified before the Grand Jury that he had seen appellant "Downstairs * * * at one of the hearings." Eugene Pressley was able to state at trial only that he had seen appellant in the Commissioner's office "back in February," leaving open the possibility that his confrontation occurred at the February 28 hearing, at which defense counsel was present. The testimony of James Pressley, that he had viewed appellant "around the first of February," is more indicative of a tainted exposure, but even appellant concedes that this statement does not indicate whether this confrontation "occurred prior to the preliminary hearing or during the preliminary hearing on February 28." (Br. 22.) Furthermore, it is quite clear that Barry Daniels

did *not* view appellant prior to this hearing. He testified at the February 28 hearing that this was the first time he had seen appellant "since the night it happened."

6. At trial Eddie Pressley testified that there was no line-up at the Commissioner's office on February 28, and that there were fewer than a dozen people in the office at that time, including detectives.

7. Eddie Pressley testified that the appellant looked back (toward the car pursuing him) on a couple of occasions. Defense counsel asked whether he remembered, in his report to the police, the following: "Q: Did this man look back in the direction of the car that followed him up the alley? A: No, he didn't." Pressley said he did not remember making this statement.

Pressley violated appellant's rights. Clemons v. United States, 133 U.S.App. D.C. 27, 34, 408 F.2d 1230, 1237 (1968), cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969).

*The testimony of the "resemblance" witnesses*

■ There remains the problem of the resemblance testimony of the two Pressleys and Barry Daniels. We cannot accept the Government's contention, and the trial court's ruling, that *Wade* and *Stovall* are wholly inapplicable to "resemblance" witnesses. While "resemblance" testimony projects some uncertainty on the part of the witness, it is part of the evidence which the jury may consider to constitute a basis for a guilty verdict, and a defendant's rights would be violated if such testimony had been obtained by the Government e. g., by an arrantly suggestive confrontation.

We do not know whether in fact in this case the police arranged a confrontation that was suggestive, or steered, or otherwise invalid. But since we must assume for sake of analysis, due to the procedural context, that this was the situation, we must also assume that the purpose of the police may have been to obtain a positive identification, and their conduct is not to be exonerated because the linkage testimony actually secured from the confrontation witnesses was weak rather than emphatic. When the prosecutor is willing to assume for discussion that the confrontation was steered or otherwise illegal, we must reject his contention that the sequence of this confrontation is inherently admissible on the ground that it is weak; that mere "resemblance" testimony is too trifling in its trial impact to warrant a hearing into the nature of the police conduct and its consequence.

*Harmless Error Ruling*

■ However, so far as the disposition of the case is concerned, the fact

that a witness can testify only as to "resemblance" may be taken into account.[8] Where the surrounding facts and evidence do not present a case of substantial doubt as to the possibility of misidentification, where there is an untainted identification testimony, where there is strong evidence independent of the testimony of resemblance witnesses showing that defendant was the offender, that combination of strengths in the Government case and weakness of the "resemblance" testimony in contributing to his convictions warrants a finding of harmless error from admission of the resemblance testimony. Such is the case before us. We are convinced beyond a reasonable doubt that the introduction of this resemblance testimony, assuming it would have been established as error following a hearing on the pretrial confrontation, was only harmless error. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In addition to Eddie Pressley's positive identification of appellant as the man he saw in the alley, there was a powerful chain of eyewitness testimony linking appellant to the crime and tracing appellant from the pharmacy to Mrs. Fewell's boarding house on French Street. With only momentary interruptions, at least one eyewitness had "the man" in sight at every stage of the sequence of events —at the scene of the crime in front of the pharmacy, and into the alley (Daniels and Nixon), in the alley (Eddie Pressley), on the run to Eleventh and R, and the knife attack there (Nixon and Daniels), the shotgun incident when he doubled back to Tenth and R (James Pressley and Cornish), the flight through the alley to French Street of the man holding what looked like a gun (Jobe Keyes); the chase down French Street of a man with a shotgun under his coat (Linda Winston), and the dash into 901 French Street, whose owner identified him on the basis of long ac-

8. We need not consider the question whether the weakness of the "resemblance" testimony may be taken under the circumstances of this case as an indication that the confrontation, assuming its illegality, failed to influence his testimony in substantial measure.

quaintance, with hands bloodied and clothes torn (Mrs. Fewell). The witnesses were consistent in their description of the man, as about six feet tall, weighing about 165 pounds, wearing coat and hat, and carrying a briefcase. The bloodstained knife, the hat, and the briefcase were identified by Patricia Robertson either as belonging to appellant or closely resembling items that did. Two shotgun shells were found in the briefcase, and a shotgun of the same guage was discovered under the porch at 901 French Street. All of these facts were established independently of any "resemblance" testimony by James and Eugene Pressley or Barry Daniels. The case against Brooks was overwhelming and we are convinced, beyond any reasonable doubt, that the weak resemblance testimony did not influence the outcome of appellant's trial and that we must leave this conviction undisturbed. Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

### III. EVIDENCE OF PREMEDITATION

Appellant also contends the Government's evidence of premeditation and deliberation was insufficient to sustain a conviction of first-degree murder, and that the trial judge improperly denied the motion for acquittal of this charge made at the close of the Government's case. While the issue is not without difficulty, we conclude that there was sufficient evidence of premeditation and therefore affirm the trial court's ruling.

We have had several occasions in recent years to consider the sufficiency of evidence of premeditation. United States v. Sutton, 138 U.S.App.D.C. 208, 426 F.2d 1202 (1969); Hemphill v. United States, 131 U.S.App.D.C. 46, 402 F.2d 187 (1968); Belton v. United States, 127 U.S.App.D.C. 201, 382 F.2d 150 (1967); Austin v. United States, 127 U.S.App. D.C. 180, 382 F.2d 129 (1967). In Austin and Hemphill we reversed first-degree murder convictions on the ground that the Government's evidence was "as consistent with an impulsive and senseless frenzy as with premeditation." Hemphill v. United States, supra, 131 U.S.App.D.C. at 48, 402 F.2d at 189. Looming large in our decision in those cases was the fact, in Austin, that the knife used in the slaying was carried by defendant as a matter of course, and, in Hemphill, that the murder weapon might have been found by defendant at the scene of the crime. Thus there was no evidence either that the defendant had brought the murder weapon with him (Hemphill), or that if he did this fact had any bearing on the issue of premeditation. (Austin.)

In Belton and Sutton, on the other hand, we found sufficient evidence of premeditation, based in significant measure on the fact that defendant came to the scene with a deadly weapon.

"[A]ppellant entered the apartment with a loaded gun. This, in our opinion, permitted an inference that appellant arrived on the scene already possessed of a calmly planned and calculated intent to kill, and supported submission to the jury of the elements of premeditation and deliberation. * * * This is not a case where the murder weapon had innocent uses, or where it appeared that the defendant habitually carried the weapon."

Belton v. United States, supra, 127 U.S. App.D.C. at 203, 382 F.2d at 152; United States v. Sutton, supra, 138 U.S.App.D.C at 218, 426 F.2d at 1212.

█ The principle of Belton applies to this case. The sawed-off shotgun which appellant carried in his briefcase to the scene of the crime was not a weapon that "had innocent uses." Nor was there evidence that appellant habitually carried it with him. Both Martha Fewell and Patricia Robertson testified that they had not seen appellant with the shotgun. The fact that appellant did not actually use the shotgun to kill Mrs. Pressley, but chose to use his knife, does not alter our conclusion. There was a single knife-wound in decedent's throat, a place "calculated to make death an unmistakable

result." United States v. Sutton, *supra*, 138 U.S.App.D.C. at 218, 426 F.2d at 1212. While there is no evidence of motive, the evidence that appellant brought the shotgun and knife to the scene of the crime was sufficient to permit the jury to infer that the killing was premeditated.

Affirmed.

APPENDIX: FACSIMILE OF GOVERNMENT EXHIBIT NO. 1

IN EVIDENCE (NOT TO SCALE)