## PEOPLE *v.* ADAMS.

1. SEDUCTION—CHASTITY—REFORMATION—CRIMINAL LAW.

Under evidence tending to support the theory that the complaining witness was seduced by respondent in Michigan, and if improper relations had existed between them in Ohio, where they had been immediately previous to the commission of the offense charged, she had reformed and intended to cohabit with respondent as his lawful wife, but was deceived by false representations and a fraudulent marriage, it was not error to instruct the jury that they might find respondent guilty of seduction if she had reformed and had been subsequently induced by artifice to yield to the respondent.

2. SAME—EVIDENCE—PREGNANCY.

The admission of evidence of the witness' pregnancy and of her chaste character did not constitute prejudicial error.

3. SAME—COMMON-LAW MARRIAGE—DEFENSES.

It is not sufficient, to establish a common-law marriage, that the respondent promised to marry the witness when they should arrive at Detroit, that he attempted to convince her by false papers that they were lawfully wedded, that he made no present promise to take her as his wife, but avoided such an agreement, and that on learning in a day or two of the falsity of his statements she discontinued their relations.

4. SAME—PROOF OF PREVIOUS MARRIAGE—EVIDENCE.

Admissions of respondent are competent to show a previous marriage, in a prosecution for seduction.

5. SAME—EVIDENCE—LETTERS AND CORRESPONDENCE.

Letters and telegrams purporting to come from respondent at a place where he stated he intended to go, sent in accordance with a previous arrangement to the mother of the prosecutrix, and containing references to matters previously discussed between them, were admissible in evidence without identifying the handwriting.

6. EVIDENCE—DEPOSITIONS—FALSE TESTIMONY.

Testimony showing that respondent procured witnesses to make false depositions was admissible, in a prosecution for seduction, in connection with the depositions themselves, as was also expert testimony that the several signatures of ostensibly different deponents were in one handwriting.

7. SAME—CROSS-EXAMINATION.

   No error was committed in refusing to permit a question on cross-examination of a witness for the people, who testified that respondent told him certain facts and procured him to depose to the same of his own knowledge, and who was asked if he had not heard other members of the household make similar statements.

8. SAME—HEARSAY—CURING ERROR.

   Hearsay evidence is harmless where the same facts are shown by competent proof.

9. CRIMINAL LAW—SENTENCE.

   The order recommitting a respondent who has served a portion of his sentence and has secured an order admitting him to bail will require him to serve the remaining portion of the sentence.

Error to recorder's court of Detroit; Connolly, J. Submitted June 24, 1910. (Docket No. 140.) Decided July 14, 1910.

John A. Adams was convicted of seduction, and sentenced to imprisonment for not less than $2\frac{1}{2}$ nor more than 5 years in the branch of the State prison at Marquette. Affirmed.

*Frank F. Bumps* and *M. H. Bishop*, for appellant.

*Philip T. Van Zile*, Prosecuting Attorney, for the people.

HOOKER, J. The complaining witness, a girl 18 years of age at the time of the transactions detailed in her testimony, was the daughter of well-to-do German people in the city of Louisville, Ky. Her testimony shows that her attention was caught by an advertisement in the matrimonial column of a Cincinnati paper. It read as follows:

" Business man of means, refined, 36, wishes acquaintance of congenial young lady, eighteen to twenty-five; fond of amusements; correspondence strictly confidential; give description. 'K9 Inquirer."

She wrote to the address mentioned, this letter:

"LOUISVILLE, KY., Sept. 21, 1908.

"*Dear Sir:* I seen your ad. in the Cincinnati Enquirer, and take the pleasure to answer it. I am a congenial, respectable, honest, young lady, 18 years of age. And I would like acquaintance of a business gentleman your age. I have blond hair, blue eyes, fair complexion, 5 feet 4 in. tall, weigh 120 lbs. And I am German-American. If you think you would like further acquaintance, I would be pleased to hear from you.

"Yours truly,
"Miss ROSA RENZ,
"1531 W. Ormsby Ave., Louisville, Ky."

"LOUISVILLE, KY., Sept. 25, 1908.

"Mr. A. J. ADAMS.

"*Dear Friend:* I take the pleasure to answer your welcome letter which I rec'd. And I am very much pleased with your description. I would also like to meet you. I have no photo of myself at present, but I will have some taken. Then I will give you one. You say you would like for me to make an appointment with you. I surely will and hope it will be a suited one to you. I would like very much for you to come down to Louisville this coming Sunday (October 4). I will meet you at the depot. Let me know what time you will come. And to which depot you will come in. And how you will be dressed. I will also write and let you know how I will be dressed. Then there will be no danger of us missing each other. Or you may come any day you wish as I am mostly always at home. I hope you will come, and I will make everything just as pleasant for you as I can. I live at home with my parents and two brothers. My father died when I was a very small child, but I have a stepfather. I will close for this time. Hoping to hear from you soon, I remain,

"Very respectfully,
"ROSA RENZ,
"1531 W. Ormsby Ave., Louisville, Ky."

"LOUISVILLE, KY., Sept. 30.

"Mr. A. J. ADAMS.

"*Dear Friend:* Your letter received. Was pleased to hear from you. My brothers are 16 and 9 years of age. I never told my mother yet of me corresponding with you. I would like to come up to Cincinnati, but my mother knows that I have no acquaintance there. And that is the

reason I could not get the money from her to come up on. But if you will send me a ticket I will come up. I will tell her I am going to spend a day with a young lady friend of mine. And then she will have no thought of me going to Cincinnati. I could come any day. And if you have honorable intention, I surely will come. I will close for this time, hoping to hear from you soon.

"Yours truly,

"ROSA RENZ,

"1531 W. Ormsby Ave., Louisville, Ky."

Defendant's letters were generally destroyed when read, as he requested. She went to Cincinnati at his request, and while there, he asked her to get married there but she refused, and went home the same day. She promised to marry him, however. He said he was obliged to go to Columbus on business and asked her if she would go up there if he should send her a ticket, and said they would get married there, and asked her to write him as soon as she got home. She did so and told him she would do so, and he sent her transportation to Columbus.

He wrote as follows:

"COLUMBUS, OHIO, November 5, 1908.

"*My Dearest Rosa:* I received your two letters, the one at the hotel, and also the one at the general delivery. The last one I got last night, and the first one I got yesterday morning. I went out at once yesterday and found out the best way for you to come. I think it is over the B. & O. to Cincinnati, and from Cincinnati over the Big Four to Columbus. It goes out of the same station that the B. & O. comes into Cincinnati. You will have about 30 minutes to wait in Cincinnati, but there is eight trains that leave there for Columbus every day, and you can get one every hour or two; so in case you miss one you can take the next one on the B. & O. from Cincinnati to Columbus. (Col. for Columbus.) There is only two or three trains all day, so you see it is best to go over the Big Four from Cincinnati to Columbus, but remember you take the B. & O. to Cincinnati, and from there the Big Four. I have telegraphed you two tickets. One you can get in the Louisville B. & O. office, and the other you get as soon as you get to Cincinnati. Right at the depot where you come into Cincinnati, that is the Big Four—

the Big Four and the B. & O. have the same depot in Cincinnati. I think you will understand now, and all you have to do is to ask for a ticket for Miss Rosa Renz that was telegraphed there for you by me. If there is anything you do not understand, or should have any trouble, all you have to do is to telegraph me. If so, address No. 46 North Third street, and I will see to it at once. But, my dearest, there is no danger at all, as the tickets are paid for and will be delivered to you as soon as you call for them. Write me as soon as you receive this, and let me know what time you will leave Louisville so that I can meet you at the depot. Trains leave Louisville at 2:30 and 8:10 in the morning and 2:10 and 5:45 in the afternoon. They will make good connection in Cincinnati with the Big Four in Columbus. Address letter care of general delivery, as that is open until about 9 p. m., but if you telegraph, address 46 North Third street. Well, my dearest Love, I will close for this time. Hoping to see you soon, with best wishes and a great many loving kisses, I remain, your ever loving

"ANTONY.

"P. S. I did not send ticket to your house, as it must be used the same day it is dated, with stamp on the back, so you see the other way is the better."

She arrived there Saturday. He took her to his boarding house, kept by a Mrs. Familton, and got her a room, and one for himself. He told her that a marriage license could not be obtained on Saturday afternoon or Sunday; so they would get married on Monday, and while there he would call her his niece. He was a man about 45 years old. On Monday he made an excuse for not getting married, but said they would go to Cleveland and be married there. On the following Saturday they left for Cleveland. On the way he proposed to pass her off as his wife, but she refused to allow this. They went to the Wayside Inn, kept by Mr. and Mrs. Kingsbury, and he obtained a separate room for her there. He made further excuses for not marrying her at Cleveland, but said they would be married in Detroit the same day that they should arrive there, and on Thursday night, November 19th, they went by boat to Detroit. They went to the

Cadillac and he again wanted to register her as his wife and he said he would get the license that day. She told him she would not pass off as his wife until she was married. He then took some rooms at a Mrs. Morse's and left her there, while he went out to get the license. Her testimony continued as follows:

"This was No. 55 Elizabeth street, west, a rooming house kept by a Mrs. Morse. We each had a room by ourselves, a front and back parlor. He then went to get the license, and he came back with the license, and he asked me my people's name, and I gave them, and he told me to sign my name to the bottom of the paper, which I did; and then he told me he would take it back and bring the certificate; and then he brought three papers and I signed my name to them, and he told me then we were married. I asked him if we didn't need a preacher to marry us, and he told me, 'No.' I told him they did down in Kentucky, and he said: 'You must remember that you are not in Kentucky—you are in Michigan.' I believed him and he put the certificate then in his trunk, and I thought it was all right. Exhibit D is what he brought back to me as the license, and Exhibit E is one of the certificates of marriage, and Exhibit F the other. He signed his name and then I signed my name to Exhibit D in his presence. He said that was necessary. Then he said Exhibit D would be filed. After I signed the license I signed the certificate. He said I would have to sign them—to sign my name. He showed me how to sign. * * * He said in Michigan we need three papers. I asked him if we did not have to have a preacher to marry us, and he said, 'No.' * * * And he says that was the reason they had the three papers in Michigan. I believed that we were married at that time, and if I hadn't I would never have lived with him. Up to that time from the 20th on, I had never had connection with a man before in my life, and I had connection with him because I thought I was his wife, and I lived with him from November 20th until the 28th. * * * About Wednesday he told me if I told anybody we were married he would pull up his trunk and leave me. I had been watching the papers to see if I could see the notice, and I couldn't; and he wanted me to tell the people I was his sister, and I suspected that we were not married; so on Friday I went to the county building to find out about the license; and

when I came back to Mrs. Morse's house I told him I had been to the county building and had found that no licenses were taken out; and he said there was, and he had paid a large amount to keep it secret; and he says I should place more confidence in him than that; and I told him: 'Well, if I was wrong, I was sorry,' and he said he would bring a man to prove that we were legally married. Then I had a talk with Mrs. Morse, and Detectives High and Larkins were sent for, and they came over in about an hour and took us both to headquarters."

Copies of these papers are here inserted.

### "AFFIDAVIT FOR LICENSE TO MARRY.

" STATE OF MICHIGAN,  } ss:
   " County of Wayne.   }

                                   " November 20, 1908.
   " John Antony Adams, as applicant for license for marriage between himself and Rosa Mary Renz, being duly sworn, deposes and says that he is acquainted with the laws of Michigan relative to marriage, as printed upon the back of this blank; that there is no legal impediment to the marriage of himself and the other person named, and that to the best of his knowledge and belief, the following statements are true:
   " Full name—John Antony Adams.
   " Age at last birthday—26 years.
   " White, Black, Mulatto, Indian—White.
   " Residence—Detroit.
   " Birthplace—New York.
   " Occupation—Physician.
   " Father's name—John L. Adams.
   " Mother's maiden name—Clara Houseman.
   " Number of times previously married.

                  "FEMALE.

   " Full name—Rosa Mary Renz.
   " Age at last birthday—18 years.
   " White, Black, Indian—White.
   " Residence—Detroit.
   " Birthplace—Louisville, Kentucky.
   " Occupation—Housework.
   " Father's name—Frederick.
   " Mother's maiden name—Mary Phloor.
   " Number of times previously married.................
   " Maiden name of bride, if widow ...................

"Subscribed and sworn to before me, S. C. Wilson, clerk, in and for Wayne county, Michigan, 20th day of November, 1908.

[Signed]     "JOHN ANTONY ADAMS.
              "ROSA MARY RENZ."

#### "CERTIFICATE OF MARRIAGE.

"I, Samuel P. Stinger, of the city of Detroit, in the county of Wayne, State of Michigan, do hereby certify that on the 20th day of November, in the year A. D. 1908, John Antony Adams, of Detroit, in Wayne county, Michigan, and Rosa Mary Renz, of Detroit, in the county of Wayne, Michigan, were united by me in the bonds of matrimony, in the city of Detroit, in the county of Wayne, State of Michigan, according to the laws of said State, the license, authorizing the marriage of said parties, having been by them delivered to me as required by law, and that there were present, as witnesses, John Antony Adams, of Detroit, and Rosa Mary Renz, of Detroit.

"Dated, November 20th, 1908.

[Signed]     "JOHN ANTONY ADAMS,
              "ROSA MARY RENZ."

#### "MARRIAGE CERTIFICATE.

"This is to certify that John Antony Adams, of Detroit, and Rosa Mary Renz, of Detroit, were by me joined together in Holy Matrimony, according to the usages of the Church, and the law of the State of Michigan, on the 20th day of November, in the year of Our Lord, 1908.

[Signed]     "SAMUEL STINGER.

"Witnesses:
    "S. C. WILSON.
    "S. P. SNYDER."

The outline of facts hereinbefore given is taken from the testimony of Rosa Renz, the complainant. As the defendant was not a witness, much of it stands uncontradicted on the record, except as it may be affected by circumstances testified to by other witnesses. There was some corroborating testimony, however, and some of the questions raised relate to it.

By way of defense, defendant caused some depositions to be filed in the case under a stipulation that he might take them in the absence of the prosecuting attorney. He

also called some witnesses, the apparent purpose being to prove that he cohabited with Rosa Renz in Columbus and Cleveland, and that Rosa Renz was a girl of dissolute habits at home.

Upon the argument, his counsel's main contentions were that he could not be guilty of the offense charged, for the reason that he had cohabited with her in Ohio the week before, and, second, that the transaction showed a common-law marriage between the parties in Detroit. These two questions will be discussed first because they are the most important.

**Unchastity.** The learned circuit judge refused to give the following request offered by defendant's counsel:

"(*a*) If you believe from the evidence that Rosa Renz had carnal intercourse with this defendant while said parties were stopping at No. 16 North Third street, Columbus, Ohio, or while they were stopping at the Wayside Inn, at Cleveland, Ohio, then I charge you that the said Rosa Renz was not a previously chaste woman, as required by law to be in order to be seduced; that no sufficient time had elapsed for her to reform before the act complained of in Detroit, Mich., and therefore that the act of carnal intercourse complained of as taking place in the city of Detroit, on the 20th day of November, 1908, and relied on in the information in the case, was not seduction, and the defendant must be acquitted."

He instructed the jury that:

"It is a part of the claim of the defense, on the other hand, that on the day in question that the complainant was not a chaste girl, and was not thus fraudulently deceived into yielding her virtue, but on the other hand, she had pursued a course of continued cohabitation with the defendant in Cleveland and Columbus, Ohio. I charge you, gentlemen of the jury, that the defendant at the bar cannot be convicted upon the charge in this court for any seduction which took place in Ohio; this court not having jurisdiction of such offense. It is not, however, true, as a legal proposition, that because a woman once submits to sexual embraces of the man, he cannot thereafter seduce her. The law does not contemplate that only virgins may be seduced, but the language of the statute is unmarried

women. If a woman has submitted to the sexual embraces of a man, and thereafter has reformed and returned to the path of virtue, she may again be seduced by the same man, although the burden of proving such reformation would be upon the prosecution.

"Every woman is presumed by law to be chaste until the contrary is shown. If, however, the evidence proved that she has departed from the path of virtue and it is sought to establish the seduction of her by the same man, her reformation and return to a chaste and virtuous character must be proven by the prosecution. So that, gentlemen of the jury, even though previous sexual intercourse between a woman and a man might be shown, yet, if the jury is satisfied that at the time of the alleged seduction she was of chaste and virtuous character, and was living a chaste and virtuous life, and was drawn therefrom by some artifice or inducement of the man, her second seduction would be as criminal as the first.

"I do not wish to be understood as intimating to you, gentlemen, in any way, that the court is of the opinion that the complainant, Rosa Renz, had sexual intercourse with the respondent before coming to Detroit. That is a fact for you to determine. If you are satisfied beyond a reasonable doubt that it was not so, and that on the 20th day of November, A. D. 1908, she was a virgin, as she claims upon the witness stand to have been, and that she yielded up her virginity to the defendant by reason of the promise, artifices, and inducements practiced upon her by him, which caused her to believe that she was his wife, wherefore, she submitted to his sexual embraces and without which she would have not submitted to his sexual embraces, you must find him guilty.

"In addition thereto, even though she had previously submitted to his sexual embraces, yet had reformed and was again chaste and virtuous, if she yielded by reason of those artifices, promises, and inducements, this, too, would constitute the crime of seduction. In the first case that I have indicated to you, as well as the last, you must be satisfied of the chaste and virtuous character of the complainant, and that she was turned aside from the path of virtue and inveigled into submitting to the carnal intercourse with the defendant by reason of artifices, promises, or inducements, without which she would not have otherwise submitted to him."

We understand this to be a correct statement of the

law, and though the jury should have found that the complainant yielded to him in Ohio, they may also have found that she had seen her error, and determined to do differently thereafter, considering all of the circumstances. We understand that defendant's counsel do not dispute the general rule, but contend that there was no testimony indicating a reformation—citing the case of *People* v. *Bressler*, 131 Mich. 390 (91 N. W. 639), where the circumstances were such that we were unable to say that there was a presumption of reformation. In the present case the court left the question to the jury with the instruction that the burden of proving it rested upon the prosecution. Under the testimony it would not be an unreasonable conclusion. The instruction was appropriate and it was correct.

In this connection we refer to some testimony, taken under objection, upon which error is assigned. It is this: The complainant testified that she became pregnant, and that she never had sexual relations with any other man, at any place or time. This testimony was competent, though perhaps of little importance. If the two facts were true, it was cogent evidence of a completed sexual act, but being wholly dependent on the truthfulness of Rosa Renz, it was probably no more convincing than her statement that they had sexual intercourse. It was not error to admit this testimony.

Marriage. The defendant's counsel offered a large number of requests in relation to their claim that the defendant and complainant were lawfully married in Detroit. If they were, this defendant was improperly convicted. The judge made no allusion to the subject in his charge, further than to say that the jury must find that she was an unmarried woman in order to convict defendant. The claim that the transaction in Detroit amounted to a valid common-law marriage seems to have been overlooked or ignored. Counsel for the State seeks to justify this upon the ground that there is no testimony in the case tending to prove the agreement necessary to

such a marriage. If we can say that such is the fact, no error was committed; otherwise the question should have gone to the jury.

We have examined the testimony and we find testimony tending to show—

(*a*) A promise to marry when they should arrive at Detroit.

(*b*) An effort to convince the complainant by false instruments which they both signed that they were thereby married.

(*c*) Defendant's statement to her that such was their effect.

(*d*) An utter absence of any suggestion of a present promise by one to the other, especially by him, that they would and did then take each other as husband and wife, and would live together as such thenceforward; but, on the other hand, most convincing evidence that he avoided any such promise, and that he had no intention to enter into the marriage relation with her.

(*e*) Cohabitation afterwards for a day or two, and until the complainant ascertained the falsity of his statements.

If this situation is one in which the law requires us to say that the parties made a valid contract of marriage, the question should have gone to the jury. If, on the other hand, the trial judge could properly say that there was no testimony tending to show a valid marriage between these parties, there was no error in the omission. Cases involving the proof of marriage arise in many ways, and common-law marriages are inferred from circumstances of greater or less significance, where the legitimacy of alleged heirs is concerned. Again there are cases where, as between an innocent woman and her seducer, it is held that promises and conduct may estop him from denying the marriage, although he had an actual intent not to be a party to a valid marriage. In a case like the present, where it is clear that the man not only intended to avoid a marriage which should bind him, and avoided making or having the woman make a present promise that they took each other as husband and wife, to be such thence-

forward, he should not be permitted to escape the consequences of his wrong by such a claim.

The cases of *People* v. *Loomis*, 106 Mich. 250 (64 N. W. 18), and *Judson* v. *Judson*, 147 Mich. 518 (111 N. W. 78), cited by counsel, are readily distinguishable from this case. In the former there was a clear, present promise, the very thing that is lacking here. In the latter, the bill was dismissed for the lack of the present promise to take each other for husband and wife. This is not a civil case arising years after a transaction, characterized by long years of cohabitation and conduct consistent with marriage, but one arising at once, depending upon the nature of the alleged promise of marriage, where the facts show that the minds of the parties did not meet in a common understanding of, and consent to, the present and future existence of the relation of husband and wife between them. The unrighteousness of the proposition that, one caught red-handed may lawfully set up the claim that the alleged contract, which he did not agree to, became nevertheless a valid marriage, binding upon both, because the woman acted in good faith and in the belief that she was married, cannot be sustained, where it affirmatively appears that it lacked the essential promise; if it can, where the duplicity has been carried so far as to make the promise, is a question we need not decide. We are of the opinion that the learned circuit judge did not err in denying these requests, and in omitting to confuse the jury by this question of marriage.

Another question arose in this connection. It was claimed by the prosecution that the defendant was a married man at the time of his relations with Rosa Renz, and if so it would be an end to the claim of the alleged common-law marriage. Counsel attempted to prove it by defendant's admissions, and error is assigned upon the admission of this testimony; it being contended that marriage cannot be so proved in criminal cases, and cited the cases of *People* v. *Lambert*, 5 Mich. 349 (72 Am. Dec. 49), and *People* v. *Loomis, supra.* The former was a

bigamy case. The latter was a seduction case, and hardly raises the question before us, as we merely held that a witness not qualified would not be allowed to prove the provisions of law in force in Canada. The *Lambert Case*, however, does hold that a defendant should not be convicted of bigamy, where the only evidence of the first marriage is proof of cohabitation and statements of the parties. It is true that the English courts have held that admissions of marriage are not sufficient to warrant a conviction in a bigamy case, or to prove marriage in a crim. con. case, following Lord Mansfield's holding in two cases, viz.: *Morris* v. *Miller*, 4 Burr. 2057, and *Birt* v. *Barlow*, 1 Doug. 174, cases often said to have been departures from the existing rule, and cases that have been severely criticised. The rule was carefully limited to these two classes of cases, and is at variance with the general rule of law pertaining to other criminal cases, with no very good reason.

But this is neither a bigamy nor a crim. con. case and we are not disposed to extend the rule, as a few courts have done. This testimony was admissible both to prove that defendant had a wife, and also as characterizing his acts in making the alleged contract. For a discussion of this question, see 3 Wigmore on Evidence, § 2084 *et seq.*

In this connection we refer to a question which arose upon the introduction of two letters and two telegrams claimed to have been sent by the defendant to Mrs. Heye, complainant's mother. She testified to one or more interviews with the defendant, after his arrest, in which he sought to induce her to go to Detroit. She stated that he came to Louisville and pretended to her to be a detective. He afterwards confessed that he was not a detective, but was defendant's brother, and at last admitted that he was the defendant; that he had done wrong; that he was married, but would soon get a divorce. He succeeded in inducing Mrs. Heye to say that she thought she would go to Detroit. He agreed to await her at Cincinnati. The letters and telegrams purporting to come from there later,

by mail and wire, bore his name (Adams), and contained allusions to the subject theretofore discussed between them. We think that they were competent evidence, although it was not shown that he signed or sent them, in any other way than through the connection that they intrinsically showed to the previous conversation and the arrangement that he should write. This furnished some evidence of their genuineness, which thus became a question for the jury. See *People* v. *Hammond,* 132 Mich. 427 (93 N. W. 1084); 17 Cyc. 411.

Depositions. In making the people's case the prosecutor called witnesses who confessed to making false depositions at the instigation of said defendant, and gave their conversations with defendant in relation thereto. These depositions were then offered in evidence to show the things that defendant had sought to prove in this way. We have already alluded to the defense that he sought to make. This testimony was admissible. It is always competent to show a defendant's complicity in obtaining or attempting to obtain false testimony to be used in his defense, and the fact that he does not use it is unimportant. It was also competent to show by expert witnesses that several different names, ostensibly of different deponents, signed to a deposition, were in the same handwriting.

It was not error to admit the examination of witnesses called by the people, in relation to the contents of their depositions, without first reading them to the witnesses. Doubtless this should have been done had they desired it; but apparently they did not. These depositions were not withheld from defendant's counsel, and were ultimately put in evidence against the strenuous protest of defendant's counsel. Referring to the witness Myers, who testified to statements which he said were false, and alleged facts which he did not know of his own knowledge, but were told him by defendant, counsel sought to show, on cross-examination, that he had heard other inmates of the

162 MICH.—25.

house make similar statements regarding the conduct of Rosa Renz. While it would have been proper to cross-examine this witness for the purpose of showing his knowledge, or that Adams did not make the alleged statements, proof that he heard others make them was unimportant. It was not substantive proof of the facts, being hearsay, and it was not inconsistent with the statement that Adams told him that. There was no error in this ruling.

The remaining assignments of error relate to unimportant matters, as the testimony stood, and we think that no injury resulted to the defendant from the rulings on which they were based; for example, the deposition of Crandall was not substantive proof in the case; hence it was not important whether he was at Wayside Inn in November, nor whether the Kingsburys said that he was or was not. The same result follows as to the proof about holes in the door and the sufficiency of the alleged test. The testimony of Larkins was harmless in regard to the statements of Familton, because he admitted the same fact practically.

We find no error in the record, and the conviction and judgment are affirmed.

Defendant's sentence was imposed before his appeal was taken and he had served a portion of his time when its execution was interrupted by an order admitting him to bail, and he was released by the warden of the State's prison. He is now subject to imprisonment under the sentence for the unexpired period thereof remaining at the time of his said release. The cause will be remanded to the recorder's court of Detroit with directions to issue a new commitment to the sheriff of Wayne county and said warden, commanding said sheriff to forthwith apprehend said defendant and deliver him to the said warden, and commanding him, the said warden, to receive and safely keep the said defendant for a period equivalent to said unexpired portion of said sentence, in accordance with the command of said original commitment.

OSTRANDER, McALVAY, and STONE, JJ., concurred.

BLAIR, J. (*concurring*). I think the evidence discloses a common-law marriage, which would have been legal and binding in its effect as well as in form, except for the previous subsisting marriage of defendant. It does not follow, however, that because defendant was guilty of bigamy he could not be convicted upon the same facts of seduction. In my opinion, the facts would support a conviction for either offense and the prosecution were at liberty to select either. *People* v. *Gibbs,* 70 Mich. 432 (38 N. W. 257); *People* v. *Smith,* 132 Mich. 58 (92 N. W. 776); *Greenman* v. *O'Riley,* 144 Mich. 534 (108 N. W. 421, 115 Am. St. Rep. 466); *People* v. *Bristol,* 23 Mich. 118.

I therefore concur in the result.