**UNITED STATES of America**

v.

**Alexander SUTTON, Appellant.**

**No. 22278.**

United States Court of Appeals
District of Columbia Circuit.

Argued May 2, 1969.

Decided Nov. 7, 1969.

Mr. John A. Terry, Washington, D. C. (appointed by this court), for appellant. Mr. William W. Greenhalgh, Washing-ton, D. C., was also appointed by this court to represent appellant.

Mr. Julius A. Johnson, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., at the time the brief was filed, Frank Q. Nebeker, Asst. U. S. Atty., at the time the brief was filed, and Harold H. Titus, Jr., Asst. U. S. Atty., were on the brief, for appellee.

Before BURGER,* TAMM and ROB-INSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal, from convictions by a jury of first degree murder [1] and the unlicensed carrying of a dangerous weapon,[2] presents two questions for our consideration. The first is whether four writings, three purportedly authored by appellant, were sufficiently authenticated by their interrelated contents, the circumstances under which they were discovered, and a connecting note found on appellant's person to qualify them for admission into evidence at his trial. The second is whether the Government adduced enough evidence of premeditation and deliberation by appellant in connection with the alleged homicide to support a verdict of first degree murder guilt.[3] We answer both questions in the affirmative, and accordingly affirm the convictions.

**I**

The Government's case against appellant [4] featured two persons, Cornelius Hall, Jr., and Alfred Allen Brock, as eyewitnesses to the offensive events. These two, on March 13, 1967, first observed appellant and Matilda Glass, the deceased, as they alighted from an automobile and

---

* Circuit Judge (now Chief Justice) Burger did not participate in the disposition of this case.

1. D.C.Code § 22–2401 (1967).

2. D.C.Code § 22–3204 (1967).

3. To sustain the charge of first degree murder, in the circumstances portrayed by the record, it was incumbent upon the Government to prove a homicide done "purposely, * * * of deliberate and premeditated malice * * *." D.C. Code § 22–2401 (1967).

4. Although we later summarize appellant's version of the affair, we must take the evidence in the light most favorable to the Government. E. g., Crawford v. United States, 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967) ; Curley v. United States, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

momentarily embraced. Suddenly appellant fired a shot, and Mrs. Glass screamed [5] and fled the arms of her companion. He gave chase with a drawn revolver, and a short distance away she fell face forward.[6] There appellant grabbed her, turned her over on her back, and at point-blank range fired two or three shots at her.[7]

The two witnesses rushed to seek assistance, hearing another shot as they left. They tried but were unable to locate a policeman, and soon came back to the scene to find appellant, revolver in hand, kneeling beside his victim. With even greater dispatch they again left in an effort to obtain aid, and this time succeeded in arranging a telephone call to the police. When they returned once more, police officers were there, and an assessment of the gruesome details was begun.

Mrs. Glass, struck by three bullets, either then was dead or died very shortly thereafter.[8] Lying wounded nearby was appellant,[9] a revolver under his right hand containing five expended cartridges and one that was live. Appellant was removed to a hospital, where seven more live cartridges were discovered in a pocket of his trousers.[10]

Found also, beside Mrs. Glass' body, was an envelope bearing these notations:[11]

From Alexander Sutton to daughter, Frances D. Sutton, JA 26671. Wife, Birdie Mal Sutton, 587–2456. Call them at once. Fort Lauderdale, Florida. My mother JA 22779.

Inside the envelope were four notes, three of which were received in evidence.[12] The lengthiest of the three

---

5. See note 10, *infra.*

6. Hall's best estimate was that Mrs. Glass traveled approximately 10 to 20 steps from the point of the embrace with appellant to the point where she fell and was repeatedly shot. Further efforts by counsel to more precisely fix the distance through comparisons within the courtroom setting narrowed the estimate to 10 or 12 feet.

7. See note 10, *infra.*

8. An autopsy performed upon the deceased on the day following her death disclosed that she had been shot three times. One bullet entered beneath the chin, causing the deposit of a dark residue on the skin at the point of impact, then traveled upward through the base of the skull and lodged in the left side of the brain. Another bullet bruised the left lower lip, dislocated three teeth and became embedded in the victim's tongue. The third entered the right lower chest, penetrated the liver and heart, and came to rest in the stomach. Either the first or the last of these three wounds was sufficient to cause death within less than 20 minutes.

9. See note 10, *infra.*

10. There is some variation in the testimony of the two eyewitnesses as to the chronolgy of the initial events and as to the number of shots fired. Hall testified that immediately after the embrace Mrs. Glass screamed and then a shot was fired by appellant. Brock's testimony indicated that he was unsure as to who fired the first shot, but

he stated that the shot preceded the outcry. Additionally, Hall related that the first shot was followed by a series of three others, and then by a fifth as he and his companion left the scene in search of police assistance. Brock's version gave only two shots in the series subsequent to the deceased's flight.

Both witnesses, however, were certain that the man accompanying the deceased was the party who pursued, grabbed and shot her at close range. Although neither was able to identify appellant as the man, that link in the chain of circumstances was furnished by the testimony of a police officer who positively identified appellant as the man who lay wounded beside the victim when, minutes later, he arrived at the scene.

11. These quotations, as well as others from the documentary evidence, are as they appear in the trial transcript. The original exhibits were not transmitted with the record on appeal. Slight variations respecting names may perhaps be accounted for by Government counsel's explanation to the court and the jury that he experienced some difficulty in deciphering the handwriting when he undertook to read the documents into the record.

12. One of the enclosures was not introduced into evidence because its sole significance lay in its reference to a note stationed in appellant's locker at his place of work. The latter note also remained outside the evidence, and all references to it in other Government exhibits were deleted.

notes mentioned difficulties between the writer and "Matilda,"[13] and indicated plainly enough that an ominous event was about to occur.[14] This note also detailed dispositions of personal estate the writer desired to make, and designated relatives of the writer by names and telephone numbers identical to those appearing on the envelope.[15] These features pointed to appellant as the penman, in a degree which was later to be judicially gauged. Another writing placed in evidence, also purportedly written by appellant, began with the words "[r]ead this other note," and identified one "Arthur" as the party who had "carr[ied] her home Sunday night."[16] The third writing received, clearly not appellant's creation, was an amorous note ostensibly from "Arthur" to an unnamed addressee.[17]

There was, at the hospital to which appellant had been removed, another discovery which was to assume special importance at the trial. In the pocket of appellant's trousers was still another note, also let into evidence, which, as read into the trial transcript,[18] was as follows:

Call Fort Lauderdale, Florida, JA 22779. Mother, Bessie Sutton, 587–2456. Wife, Birdie Neal Sutton. Daughter, Frances Sutton [more numbers].[19]

The Government's proffer of the envelope and the notes in evidence was strenuously resisted on the ground, *inter alia*, that they were not properly au-

13. As stated in the text, this was the deceased's forename.

14. This note read as follows:

To my daughter. Call her at Florida, JA 26671 587–2456. Frances D. Sutton, Fort Lauderdale Florida.

The car note is paid until April 12. It is paid until then until it paid for March 12. Send it on the 13th Frances, don't worry about what happened. You all just keep the car. I am sick. Let me say this. I might not get a chance to paid, but it might be in my pocket and the card where I send the money over to you all I have the most of the thing fix up.

I have some money on my job. I would not have done this but Matilda made me do this. Now we will both are in bad shape. I have no other choice at all. I have something pack. All of the lamps of mine, two floor lamps, one table lamp, Frances, the car may be paid for. These are the people that owe me where I work at the Shoreham West. These are the number.

Mr. Mazor, L614, $25. Mrs. Sherling or Sherring, L2517, $25. Mr. Birch, L312.

Just a few days there are two snow tires put in the receiving room. One way or the other, it will be two of some kind left in there. The diamond ring, give it to Jal on my finger. The watch for Lloyd, my son. I have spent hundred of dollars on this woman. But the Judge will not believe it of the jury.

There are some checks to show and the rest in cash. Hub Furniture Store and we will put a hundred on the house which was my money. I have live with her for at least five or five and a half months. She were treated better than my wife or any other woman. There is $40 of $47 in my pocket.

Bessie Sutton, mother, Fort Lauderdale Florida, Ja 22779. Birdie Sutton, wife, Fort Lauderdale, Florida 587–2456. My daughter, Frances Sutton, JA 26671.

15. See note 14, *supra*.

16. March 13, 1967, the day of the alleged homicide, was a Monday.

17. In overall tone, this note, dated August 30, 1966, was something of a temporary farewell to the addressee. In it, "Arthur" stated, among other things, "that I will always cherish the moments and time that I have spent with you and even today I have the same feeling in respect for you that I had the day I stopped you in the Shoreham driveway." Later, he said that "[i]f this comes out okay someday later, I hope I can make you real happy like we used to be, at least for one day, anyhow." He concluded: "But always remember I do love you regardless of what or who. Please be careful and don't do anything to get yourself in trouble."

18. See note 11, *supra*.

19. We are not benefited by information respecting the other numbers. Government counsel, reading this note to the jury, stated simply that "there are some numbers appearing at the bottom which seem to have no relevancy."

thenticated. The trial judge, after entertaining extensive argument by counsel, overruled the objection and allowed the prosecutor to read the envelope's inscription and three of the notes to the jury.[20] The judge also denied appellant's motion for a judgment of acquittal, presented at the conclusion of the Government's case in chief, and appellant then proceeded with his defense.

A witness, James Arthur Sewell,[21] told of two conversations with the deceased in which she evinced a desire to arm herself with a gun.[22] Appellant took the witness stand himself to relate the version of the affair that follows. He commenced living with the deceased in February, 1966, but toward the end of the year the romance soured when he came across the love letter from Arthur.[23] He purchased a gun—the murder weapon, it developed—and ammunition for it in February, 1967; that gun, and one belonging to the deceased, resided in a dresser drawer in the apartment they occupied.[24] The relationship became stormy when, shortly prior to her death, the deceased locked appellant out of the apartment and took a shot at him as he forcibly reentered.[25] That incident landed the parties in court,[26] but nonetheless they continued to live together.

Continuing, appellant testified that on the night of March 13—the fatal date—there was a quarrel at the apartment. She threatened to "fix" him, and started to the bedroom. Fearing that she would

get and perhaps use his gun, appellant himself took the gun, which he pocketed along with some cartridges and the envelope containing the notes, and left the apartment, only to be followed by her. Outside, she reached into his pocket for the gun, and in the tussle that ensued he was shot in the chest. He had no recollection of ever taking the gun from her, or of the manner in which she was shot.

The jury, as we have stated, returned verdicts finding appellant guilty of murder in the first degree and carrying a dangerous weapon. The jury could not, however, agree on the punishment to be imposed on the murder conviction. The trial judge sentenced appellant to life imprisonment on that conviction,[27] and to a concurrent one-year term of imprisonment on the other. This appeal followed.

## II

Ordinarily, documentary evidence possesses no self-authenticating powers;[28] unaided by an operable presumption, its reliability is not automatically assumed. The legal requirement obtaining in normal contexts is that its genuineness be shown independently before it is accepted as proof.[29] The contention is vigorously pressed upon us that the communications purportedly written by appellant and "Arthur" were not sufficiently authenticated prior to their submission for consideration by the jury. Our scrutiny of the record in the light

20. The notes read were those quoted, wholly or partially in text *supra* following notes 11 and 18, and in notes 14 and 17, *supra*.

21. This witness testified that he wrote the note quoted from in note 17, *supra*, but that he did not make the signature "Arthur" appearing thereon.

22. At some time prior to the offense date, the witness said, the deceased sought information as to where she could obtain a gun. Later, in March, 1967, the witness added, the deceased told him that the police had taken her gun, see text *infra* at note 25, and inquired as to whether she could get it back.

23. *Supra* note 17.

24. See note 22, *supra*, and note 25, *infra*.

25. Following this incident, the police confiscated the deceased's gun. Consequently, only appellant's gun was in the dresser drawer on the fatal date.

26. Appellant was brought into court on the deceased's complaint of unlawful entry and destroying property, and the case was continued to a future date. There is some indication that that date was the date on which the deceased was killed.

27. See D.C.Code § 22-2404 (1967).

28. See, however, notes 37-39, *infra*, and accompanying text.

29. Sprinkle v. United States, 150 F. 56, 59 (4th Cir. 1906); Hartzell v. United States, 72 F.2d 569, 578 (8th Cir. 1934).

of the authorities leads us to conclude that the writings were properly received in evidence.

 Indubitably, the sufficiency of a showing of authenticity of a document sought to be introduced into evidence is a matter residing in the sound discretion of the trial judge.[30] As is always true with discretionary exercises, there are discernible limits which judges must not transcend, but the judge's assessment of admissibility is vulnerable only if the error is clear.[31] The applicable test to determine error is not whether the evidence of genuineness induces a belief beyond a reasonable doubt that the document is the handiwork of its alleged drafter, but whether, if it is uncontradicted, a reasonable mind might—though not necessarily would—fairly conclude favorably to the fact of authorship.[32] In the case at bar, the contents of the questioned notes, conjoined with the circumstances surrounding their discovery,

fashioned an adequate basis for the ruling admitting them in evidence.

 We abide fully the usual judicial concession "that the mere *contents of a written communication,* purporting to be a particular person's, are of themselves not sufficient evidence of genuineness."[33] Such a rule serves meaningfully as a protective device minimizing the occasion for fraud on the innocent and imposition on the courts. At the same time, we recognize the general proposition that authorship of writings may be shown by circumstantial evidence,[34] among the components of which the contents of the writing may play a significant role.[35] Circumstances beyond the four corners of a document may point with sufficient certitude to the person whose pen created it.[36] Moreover, "in special circumstances, where the contents reveal a *knowledge* or other trait peculiarly referable to a single person, * * the contents alone [may] suffice,"[37]

30. Reynolds v. Pegler, 223 F.2d 429, 435 (2d Cir. 1955); Jenkins v. Associated Transport, Inc., 330 F.2d 706, 710 (6th Cir. 1964); Arena v. United States, 226 F.2d 227, 235 (9th Cir. 1955), cert. denied, 350 U.S. 954, 76 S.Ct. 342, 100 L. Ed. 830 (1956).

31. Alvardo v. Anderson, 175 Cal.App.2d 166, 346 P.2d 73, 81 (1959); Southwick v. Massachusetts Turnpike Authority, 339 Mass. 666, 162 N.E.2d 271, 274 (1959); Ollok v. United Heat Treating Co., 318 S.W.2d 785, 787 (Tex.Civ.App.1958).

32. Lundgren v. Union Indem. Co., 171 Minn. 122, 213 N.W. 553, 555, 52 A.L.R. 580 (1927); O'Donnell v. Kansas City Life Ins. Co., 277 S.W. 973, 976 (Mo. App.1925). The courts vary considerably in statement as to the standard which a showing on authenticity must meet before the document may be placed in evidence. Those at one end of the spectrum require "satisfactory" proof; for those at the other end the proof must be conclusive. See the cases collected in Annot., 41 A.L.R.2d 578 (1955). Compare People v. Molineux, 168 N.Y. 264, 61 N.E. 286, 62 L.R.A. 193 (1901) and State v. Lyle, 125 S.C. 406, 118 S.E. 803 (1923), which differentiate between civil and criminal cases, and in the latter require proof of genuineness "beyond a reasonable

doubt." In our view, however, it is exclusively the jury's function to ascertain the sufficiency of the evidence to convict, and the judge's role to determine whether proffered evidence has enough prima facie trustworthiness to warrant its consideration by the jury for that purpose. The rule stated in text embodies that distinction.

33. 7 J. Wigmore, Evidence § 2148 (3d ed. 1940) (emphasis in original).

34. Chaplin v. Sullivan, 67 Cal.App.2d 728, 155 P.2d 368, 372 (1945); Cotton States Mut. Ins. Co. v. Clark, 114 Ga.App. 439, 151 S.E.2d 780, 785 (1966); People v. Adams, 162 Mich. 371, 127 N.W. 354, 356 (1910); Lundgren v. Union Indem. Co., *supra* note 32; Maynard v. Bailey, 85 W. Va. 679, 102 S.E. 480, 481, 9 A.L.R. 981 (1920).

35. Lundgren v. Union Indem. Co., *supra* note 32, 213 N.W. at 554.

36. In re Spoye's Estate, 129 Mont. 83, 282 P.2d 452 (1955); Crisafulli v. State, 198 Misc. 941, 100 N.Y.S.2d 773 (N.Y.Ct.Cl. 1950); State v. Manos, 149 Wash. 60, 270 P. 132 (1928).

37. 7 J. Wigmore, Evidence § 2148 (3d ed. 1940) (emphasis in original). See also Hartzell v. United States, *supra* note 29, 72 F.2d at 582; Chaplin v. Sullivan, *su-*

and where a document, purportedly that of a particular person, makes reference to facts peculiarly known to him, the "manifest probabilities"[38] that the document is his permit a logical conclusion that in actuality he is in fact the composer.[39] The receipt of otherwise unauthenticated writings in evidence under such conditions adequately safeguards the policy considerations underlying the broad rule disfavoring authentication of writings solely on the basis of what they contain.

## III

The situation before us is interlaced with artifacts pointing to appellant's hand in the generation and placement of the questioned writings.[40] The envelope and the notes inside it were found beside the body of the deceased at the site of the macabre events that gave birth to the prosecution. The envelope bore the name of appellant as the addressor, and designated three persons, all described as close relatives, as the intended addressees.[41] Full names, including the surname "Sutton," were supplied for two of the latter, as were telephone numbers for each of the three.[42] Inscribed on the face of the envelope was the single entreaty "[c]all them at once."[43]

One of the envelope's enclosures, beginning "[r]ead this other note," named "Arthur" as the man who had taken "her" home on a Sunday night,[44] which could have been the night before the homicide.[45] Another, signed "Arthur," contained enough to explain why someone—perhaps our appellant—might have become upset over "Arthur's" affair with "her."[46] A third note gave the names and telephone numbers of three persons, each with the surname "Sutton" and otherwise denominated kinfolk, and requested that they be contacted.[47] In names, telephone numbers and specifications of kinship, these designations matched exactly those appearing on the covering envelope.[48]

Additionally, the latter note discussed intimate business and personal affairs which, if true,[49] would have been peculiarly within the writer's knowledge. Included were references to the author's difficulties with "Matilda,"[50] and expressions of despondency over the deterioration of his own relationship with her.[51] Included, too, were a summary statement of the status of the writer's financial affairs, and the dispositions he desired of his worldly estate.[52] We do not suggest that appellant's authorship of this note was sufficiently denoted to qualify it for admission simply on the basis that such matters would normally reside solely within appellant's knowledge, for here there was no attempt by the Government to prove their accura-

pra note 34; Ashlock v. Commonwealth, 108 Va. 877, 61 S.E. 752 (1908); Maynard v. Bailey, *supra* note 34, 102 S.E. at 481.

38. Maynard v. Bailey, *supra* note 34, 102 S.E. at 481.

39. See the cases cited *supra* note 37 and accompanying text.

40. We test the trial judge's ruling accepting the envelope and notes in evidence without regard to appellant's subsequent testimonial admissions, which alone might have warranted the conclusion that he had previously possessed the note from "Arthur" and had himself written the others. Compare Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

41. See text *supra* following note 11.

42. See text *supra* following note 11.

43. See text *supra* following note 11.

44. See text *supra* at note 16.

45. See note 16, *supra*.

46. See note 17, *supra*.

47. See note 14, *supra*.

48. See note 14, *supra*.

49. See note 53, *infra*.

50. The forename of the deceased, we reiterate.

51. See note 14, *supra*.

52. See note 14, *supra*.

cy.[53] This shortcoming is overcome, however, by its other evidentiary virtues, particularly its clairvoyant qualities in terms of personal history that was yet to be made.

The writer forecasted portentous events. His words clearly contemplated suicide and probably murder as well. This latter thought is revealed not merely by the statement that "[n]ow we will both are in bad shape," [54] but is bolstered by the moribund mood permeating the note. Its tenor indicates an author who expected that his life would soon be terminated. It also suggests that the deceased's conduct was the driving force to that end, and intimates that she too was doomed. These are thoughts uniquely within the mind of the one planning a murder-suicide, a deed which, as things eventuated, seemingly was partially accomplished. Appellant came to the death scene with a loaded gun and seven more live cartridges in his pocket. He fired several shots at the deceased at close range, and then wounded himself. These were facts of record at the time intro-

duction of the note was sought. A jury could reasonably feel that only by irrationally defying the probabilities could one say that the author of the note was not describing the events later witnessed by Hall and Brock.

Not only were there these indicia of a connection between appellant and the interrelated documents at the scene, but further indication of such a nexus was supplied by another note found in appellant's pocket after his admittance to the hospital. The probability of genuineness of that note is enhanced by its discovery in appellant's possession, an unchallenged factor increasing the prospect that he was the scrivener.[55] And the note listed the same persons—by the same names, the same familial relationships, and in two instances the same telephone numbers—as were furnished by the writings beside the deceased's body.[56] The documents found in the two locations bore obvious similarities in subject matter and style, and in common pled that the named relatives be called.[57] While the interrelation of all of the documents

---

53. It is obvious that one's authorship of a document is not connoted simply by its reference to what supposedly is a fact known only to him unless the so-called fact is shown to be actually true. A note giving the combination of a safe exclusively within A's knowledge indicates that A wrote it. The indication is lacking if the safe defies opening when the dial is spun strictly in accordance with the information in the note, however much that information had seemed to be the combination.

While some of the matters discussed in the note in suit, if factually accurate, tended to earmark appellant as the author, there is little or nothing to show that they were accurate. The record does not explain why no effort was made in that direction at trial, or why there was no resort to a handwriting analysis. Nonetheless, if the Government's demonstration on authenticity sufficed legally for the purpose, it is immaterial that the authenticity requirement might have been better met by another method. "It is not ground for complaint that the Government chose instead to stake the prosecution on evidence that appellant regards as proof of a distinctly lower order." Powell v. United States, 135 U.S.App.

D.C. 254, 258, 418 F.2d 470, 474 (1969) (footnote omitted).

54. See note 14, *supra.*

55. We find a close analogy in cases permitting the introduction into evidence of writings found in the possession of an accused as exemplars for purposes of expert comparison with the handwriting in a disputed document. The courts have frequently sanctioned receipt of the exemplar when there were additional circumstances supporting its authenticity. See Dean v. United States, 246 F. 568 (5th Cir. 1917) (handwriting taken from defendant's memorandum book); People v. Davis, 65 Cal.App.2d 255, 150 P.2d 474 (1944) (application for bank loan taken from defendant's wallet); Little v. Rogers, 99 Ga. 95, 24 S.E. 856 (1896) (possession of notes coupled with fact that the deceased paid them). In at least a few cases, possession alone was deemed sufficient. See Chisolm v. State, 204 Ala. 69, 85 So. 462, 463 (1920); Whaley v. State, 11 Ga. 123 (1852).

56. See note 14, *supra,* with which compare text *supra* following notes 11 and 18.

57. See note 14, *supra,* with which compare text *supra* following notes 11 and 18.

was such that each tended to afford reassurance of the authenticity of the others, the most important single welding agent was perhaps the in-pocket note. For it strengthened both the already close integration of the on-scene writings and their tie to appellant; indeed, the trial judge considered it to be the clinching item.

In our view, the aggregated circumstances forged such links between the questioned writings and appellant as reasonably to enable findings by the jury that he was a prior possessor of the note from "Arthur" and the author of the remainder. By the same token, we conclude that the trial judge did not exceed his authority in letting the writings in. Indeed, we applaud his identification and synthesis of the relevant factors, his sensitivity to the need for a firm circumstantial foundation for admission, and the caution with which he proceeded to his ruling. We hold that the disputed exhibits were properly accepted in evidence, and were entitled to such consideration as the jury was inclined to give them.

### IV

 Appellant posits disjunctively the insufficiency of the Government's evidence on premeditation and deliberation to withstand a motion for a judgment of acquittal or to sustain a verdict of guilty as to the charge of first degree murder.[58] This, he maintains, is so whether or not the writings in controversy were to be placed on the evidentiary scale. Our conclusion favoring admission of the writings limits the present need, of course, to a consideration of the capabilities of the total proof at the time appellant's challenge came forth.[59]

The framework within which we examine disputes over the legal adequacy of evidence to support conviction has long since been decisionally constructed.[60] To be scrupulously honored is the distinction between the measure of proof which is required for submission of the charge to the jury and that which is necessary for conviction. "[I]n deciding whether to submit a case to the jury the trial judge must consider whether reasonable jurymen must necessarily have a reasonable doubt," in which case a judgment of acquittal is directed, "or whether, on the other hand, the evidence was such that a reasonable mind might fairly have a reasonable doubt *or might not* have such doubt,"[61] in which event the submission is made. The standard remains unchanged when the judge scrutinizes the evidence after verdict of guilty and discharge of the jury to determine whether the accused is legally entitled to an acquittal.[62] Beyond these requirements, *"for the jury* to convict, it must," of course, "be persuaded of the defendant's guilt beyond a reasonable doubt."[63] Thus the determinations on potential and actual convincing power of the evidence characterize the respective functions of judge and jury and confines each to its legitimate sphere.

Just what the Government had to prove, to establish prima facie those elements of first degree murder, is a matter equally free from ambiguity.[64] Pre-

58. See text *infra* at note 62.

59. See text *infra* at note 67.

60. See the cases *infra* notes 61–62.

61. Crawford v. United States, *supra* note 4, 126 U.S.App.D.C. at 158, 375 F.2d at 334. See also Curley v. United States, *supra* note 4, 81 U.S.App.D.C. at 392–393, 160 F.2d at 232–233.

62. 2 C. Wright, Federal Practice and Procedure §§ 465, 467 (1969).

63. Crawford v. United States, *supra* note 4, 126 U.S.App.D.C. at 158, 375 F.2d at

334. See also Curley v. United States, *supra* note 4, 81 U.S.App.D.C. at 392, 160 F.2d at 232.

64. "Premeditation and deliberation are facts, susceptible of proof like any other facts in a criminal trial. The jury is not supposed to be rendering a moral judgment of culpability based on whether it likes the defendant, or is horrified by the brutality of killing. Whatever the difficulties of proving states of mind, and whatever the wisdom of distinguishing degrees of murder on that ground, the law now puts the burden of proving

meditation means "giving thought, before acting, to the idea of taking a human life and reaching a definite decision to kill. In short, premeditation is the formation of a specific intent to kill." [65] And "[d]eliberation * * * is consideration and reflection upon the preconceived design to kill; turning it over in the mind; giving it second thought." [66] Since appellant appropriately threw down the gauntlet when the Government rested its case in chief, it becomes our duty to determine whether the proofs as they then stood, unaided by those appellant subsequently offered, sufficed to discharge the Government's burden.[67]

Appellant's attack concentrates on the testimony of Hall and Brock, the two who gave eyewitness accounts at the trial. He contends that their version, necessarily covering only the span of events they observed, leaves no room for the essential findings. One could not reasonably say from what the two witnesses related, appellant urges, that he had given "thought, before acting, to the idea of taking a human life," [68] or that he reached "a definite decision to kill" [69] or, assuming even a preconceived design to kill, that he had reflected upon it, "turning it over in [his] mind; giving it second thought." [70] In the language

of a past decision, "[t]here is nothing deliberate and premeditated," we are told, "about a killing which is done within a second or two after the accused first thinks of doing it." [71] Circumstances outside the eyewitness accounts, we are admonished, were too impotent to rectify the shortcomings of the direct testimony.

In our studied view, however, the jury, in appraising the Government's evidence in chief in its entirety, was not obliged to take the eyewitnesses' beginning observations as the starting point. The writings admitted in evidence argued the contrary and, we have already held, those writings could appropriately be weighed by the jury.[72] Now we examine the writings for both the interpretation and the effect which the jury was at liberty to ascribe to them.

One of the writings spoke ruefully of the degeneration of appellant's romance with the deceased to a condition that from his viewpoint was beyond redemption.[73] "Now we will both are in bad shape," it read, "I have no other choice at all." [74] The blame for this state of affairs, it continued, was the deceased's —"I would not have done this but Matilda made me do this" [75]—a responsibility abetted, according to two other

premeditation and deliberation on the prosecutor, and moreover requires that his evidence do so beyond reasonable doubt." Hemphill v. United States, 131 U.S.App.D.C. 46, 50, 402 F.2d 187, 191 (1968).

65. Austin v. United States, 127 U.S.App. D.C. 180, 186 n. 12, 382 F.2d 129, 135 n. 12 (1967), quoting instructions approved in Fisher v. United States, 328 U.S. 463, 469, 66 S.Ct. 1318, 90 L.Ed. 1382 n. 3 (1946).

66. *Id.* at 186 n. 12, 382 F.2d at 135 n. 12.

67. Powell v. United States, *supra* note 53, 135 U.S.App.D.C. at 257, 418 F.2d at 473, n. 9; Austin v. United States, *supra* note 65, 127 U.S.App.D.C. at 189, 382 F.2d at 138; Crawford v. United States, *supra* note 4, 126 U.S.App.D.C. at 158, 375 F.2d at 334; Cephas v. United States, 117 U.S.App.D.C. 15, 17–19, 324 F.2d 893, 895–897 (1963). And appellant

did not waive his objection to deficiencies in the Government's proof by thereafter offering proof of his own. Belton v. United States, 127 U.S.App.D.C. 201, 203 n. 2, 382 F.2d 150, 152 n. 2 (1967); Austin v. United States, *supra* note 65, 127 U.S.App.D.C. at 189 n. 20, 382 F.2d at 138 n. 20.

68. Austin v. United States, *supra* note 65, 127 U.S.App.D.C. at 186 n. 12, 382 F.2d at 135 n. 12, quoted in text *supra* at note 65.

69. *Id.*, quoted in text *supra* at note 65.

70. *Id.*, quoted in text *supra* at note 66.

71. Bullock v. United States, 74 U.S.App. D.C. 220, 221, 122 F.2d 213, 214 (1941).

72. Part II, *supra.*

73. See note 14, *supra.*

74. See note 14, *supra.*

75. See note 14, *supra.*

notes, by "Arthur."[76] It was fairly evident from appellant's testamentary preparations that his suicide was about to be undertaken.[77] He supplied information as to the indebtedness owed him, named the intended objects of his earthly bounty, specified the dispositions he desired, and thrice requested that close relatives be contacted, furnishing their telephone numbers.[78] But not only was suicide suggested, but murder of the deceased as well. Why suicide unless there was to be murder—a question appellant seems to have answered himself. "Now we will both are in bad shape,"[79] he wrote, the deceased likely so by reason of plans in store for her, and as a prediction, the homicidal events bore him out. Moreover, the envelope containing the principal documentary data was placed beside the body of the victim, perhaps dramatically, and there was an interlinking note in a pocket of his trousers, perhaps for ready discovery.[80] So it was, as we have already stated,[81] that the writings, in both tone and substance, indicated that appellant had a murder-suicide in mind.

This became all the plainer as the last events in the deceased's life began to unfold. Appellant brought her to the spot where they transpired, and also brought a revolver loaded with six live cartridges, and seven more live cartridges in his pocket.[82] Even while holding the deceased in his embrace, appellant fired a shot; when she broke away, he pursued her. When, a short distance away, she fell to the ground he rolled her over on her back, and fired away at point-blank range. Three bullets he pumped into her body, at places calculated to make death an unmistakable result.[83]

Quite recently, in Belton v. United States,[84] we treated the instant problems in a factually similar situation. There the accused went to the apartment occupied by his estranged common-law wife and shot her six times as she lay in bed. The evidence did not reveal a specific motive for the killing, or any threats immediately prior to its occurrence. The claim there was that the time interval between the accused's entry into the apartment and the shooting was too brief to permit affirmative findings on premeditation and deliberation.[85] We disagreed, and affirmed his first degree murder conviction. We pointed to evidence that the defendant and the deceased had constantly quarreled when they lived together, and that there had been a disagreement earlier on the date of the homicide. But for us, "[m]ore significant [was] the testimony that appellant entered the apartment with a loaded gun. This, in our opinion, permitted an inference that appellant arrived on the scene already possessed of a calmly planned and calculated intent to kill, and supported submission to the jury of the elements of premeditation and deliberation."[86]

---

76. See text *supra* at note 16, and note 17, *supra*.

77. See note 14, *supra*.

78. See text *supra* at notes 12–19, and accompanying notes.

79. See note 14, *supra*.

80. See text *supra* at note 18.

81. See text *supra* following note 54.

82. See text *supra* at notes 5–7, 10.

83. See note 8, *supra*.

84. *Supra* note 67.

85. See note 87, *infra*, and accompanying text.

86. Belton v. United States, *supra* note 67, 127 U.S.App.D.C. at 203, 382 F.2d at 152. In *Belton*, we added:

True, several of the Government's witnesses stated that they had seen appellant with that gun on several prior occasions and that it had been "around the house long before" the night of the murder. This testimony added a factor for the jury to consider in determining whether to make the inference that appellant had premeditated and deliberated the killing, but it did not make that inference impermissible. This is not a case where the murder weapon had innocent uses, or where it appeared that defendant habitually carried the weapon.

We reach the same conclusion in the case at hand. We face no question as to the amplitude of time for appellant to meditate and deliberate;[87] the crux of the issue is whether the Government's evidence, as to whether he did or did not, was such that "reasonable jurymen must necessarily have [had a reasonable] doubt."[88] The evidence does not conjure up images consistent with a killing while in an "impulsive and senseless frenzy,"[89] nor do we deal with a seemingly motiveless killing.[90] There is the Government's documentary evidence from which the jurors might reasonably have gleaned that the homicide was performed by a rejected suitor so despondent that he had decided to end his own life and that of his rejector as well.[91] There are, too, appellant's carrying of the murder weapon to the death scene, and the barbarous events that took place there. We cannot conclude that the jury could not find beyond a reasonable doubt such premeditation and deliberation as sustains the verdict finding appellant guilty of murder in the first degree.

Affirmed.

*Id.* at 203, 382 F.2d at 152. The last quoted sentence distinguishes Austin v. United States, *supra* note 65, where the accused customarily kept the murder weapon, a pocket knife used to trim nails, in his pocket, with the result that its ready availability was not indicative of a prior criminal state of mind. See also Hemphill v. United States, *supra* note 64, where the Government's evidence did not show whether the accused brought the homicidal weapon, a hammer, with him. In the instant case, there was nothing in the Government's evidence to suggest that appellant had a gun in his pocket as a matter of course.

87. As we have mentioned, the Government's evidentiary presentation did not confine the jurors' opportunity for finding these elements to the events at the death scene. Compare Austin v. United States, *supra* note 65, 127 U.S.App.D.C. at 187–188, 382 F.2d at 136–137.

88. Curley v. United States, *supra* note 4, 81 U.S.App.D.C. at 392, 160 F.2d at 232.

89. Hemphill v. United States, *supra* note 46, 131 U.S.App.D.C. at 48, 402 F.2d at 189.

90. Compare Hemphill v. United States, *supra* note 64, 131 U.S.App.D.C. at 47–48, 402 F.2d at 188–189.

91. We are advertent to the absence of evidence denoting precisely when the writings were composed but deem that circumstance no barrier to their consideration by the jury. We do not have here the special circumstances present in Coppedge v. United States, 114 U.S.App.D.C. 79, 84, 311 F.2d 128, 133 (1962), cert. denied, 373 U.S. 946, 83 S.Ct. 1541, 10 L.Ed.2d 701 (1963), nor would we in any event be inclined to follow Cohen v. New York Life Ins. Co., 21 F.2d 278, 280 (3d Cir. 1927), criticized in 7 J. Wigmore, Evidence § 2131 at 572–573 n. 5. We think that enough contemporaneity was indicated to qualify the writings for the jury's consideration by the sheer weight of the probabilities favoring genuineness arising from the coincidence of their contents, on the one hand, and the fatal episode and the location of the writings thereafter on the other. See People v. Reid, 193 Cal. 491, 225 P. 859, 860 (1924).